Jeannette GANOUSIS, Plaintiff,

v.

E.I. du PONT de NEMOURS & COMPANY, Defendant.

Eva CAZARES, Plaintiff,

v.

E.I. du PONT de NEMOURS & COMPANY, Defendant.

Nos. 90 C7106, 90 C7329.

United States District Court, N.D. Illinois, E.D.

Aug. 26, 1992.

Ronald Goldser and Barry Reed, Zimmerman Reed, Minneapolis, Minn., for plaintiff.

Eugene Schoon, Robert Downing, Amy Mayber, Sidley & Austin, Chicago, Ill., David Cantelme, Lewis and Roca, Phoenix, Ariz., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Jeannette Ganousis ("Ganousis") and Eva Cazares ("Cazares") have sued E.I. du Pont de Nemours & Company ("du Pont"), each claiming injury from a temporomandibular joint ("TMJ") implant that had used a product bearing the "Proplast" trademark. Proplast was manufactured by Vitek, Inc. ("Vitek") with the use of raw materials purchased from du Pont. Vitek has since gone bankrupt, so Ganousis and Cazares (like many other persons around the country who suffered serious injuries when their own implants deteriorated in place) seek recovery from du Pont's deep pocket.[1]

In the course of preparing its opinion on issue-narrowing motions that had been filed by du Pont under Fed.R.Civ.P. ("Rule") 16, this Court came to question whether either Ganousis or Cazares had timely filed her lawsuit. Unlike that issue, which posed discrete factual questions applicable only to Ganousis and Cazares, the parties' submissions on du Pont's Rule 16 motion had implicated several substantive issues that seemed to be shared with every one of the Proplast lawsuits as to which Zimmerman Reed on the one hand and du Pont's general counsel on the other are doing business on so many judicial fronts (indeed both sets of lawyers have made this Court their regular pen pal, forwarding opinions from other courts as like motions are decided elsewhere).

---

1. Both Ganousis and Cazares are represented by the Minneapolis firm of Zimmerman Reed (lead counsel is Ronald Goldser of that firm). Those lawyers have also represented a large number of plaintiffs in other Proplast actions across the nation, including their filing of the Minnesota class action complaints referred to later in the text.

It might well have been the litigants' preference that this Court should address the broader and more generally applicable legal questions—each side hoping for a favorable ruling that could in turn be similarly distributed to other courts (for whatever persuasive force—if any—such a ruling might have elsewhere). But in this Court's view, the potential limitations problem referred to in this Court's May 1 and May 18, 1992 opinions calls for that narrower issue to be dealt with before having to face (or perhaps not having to face) such issues of broader application and greater complexity. For that reason the May 18 opinion had directed the parties to engage in whatever discovery might be necessary to flesh out the limitations question. After that was done, the parties completed the then-scheduled briefing of the limitations issue.

At that point this Court was constrained to issue still another brief memorandum opinion (this one dated August 11, 1992) directing Zimmerman Reed, as counsel for Ganousis and Cazares, to focus on the issues more sharply than their memorandum filed a day earlier had done. Now plaintiffs' counsel have finally come to grips with the relevant issues in their latest submission, captioned "Plaintiffs' Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment Renewed Pursuant to the Court's May 18, 1992 Order" (cited "Supp.Mem." or "P.Supp.Mem."). du Pont's proposed dismissal of both actions on statute of limitations grounds is therefore ripe for determination.

### Facts

Ganousis brought her lawsuit here on December 7, 1990, while Cazares sued on December 18 of that same year. There is a dispute between the parties as to when each plaintiff was put on the type of inquiry notice that would start the Illinois limitations clock ticking (see Ill.Rev.Stat. ch.

110, ¶¶ 13–202, 13–213(d); Nolan v. Johns-Manville Asbestos, 85 Ill.2d 161, 171, 52 Ill.Dec. 1, 5, 421 N.E.2d 864, 868 (1981)). Zimmerman Reed (in their Mem. with Regard to Statute of Limitations Issues 2, 4) have acknowledged that Ganousis should have known of her alleged injuries by February 20, 1988 [2] and that Cazares should have known of her alleged injuries not later than May 25, 1988 [3]—though in their most recent Supplemental Memorandum they have raised a new argument that would move the commencement date for the running of limitations forward even further than those dates (under the "continuing tort" theory discussed later in this opinion). du Pont would place both kickoff dates several months earlier than Zimmerman Reed would admit to at best, charging Ganousis with inquiry notice on December 2, 1987 (that was the date of the CT scan to which Dr. Lagrotteria later referred) and attributing inquiry notice to Cazares not later than December 17, 1987 (when her tomograms showed bilateral degenerative changes and implant fracture).

Before either of plaintiffs' actions was filed here, Zimmerman Reed had brought three putative class actions in Minneapolis against Vitek, du Pont and Vitek's principal Charles Homsy:

1. *Blaschke–Mansfeldt v. Vitek, Inc.*, No. 89–1534 (Dist.Ct. 4th Judicial Dist., Hennepin Cty., Minn.);

2. *Monsaas v. Vitek, Inc.*, No. 89–7382 (Dist.Ct. 4th Judicial Dist., Hennepin Cty., Minn.) and

3. *Dietz v. Vitek, Inc.*, No. 3–89–711 (D.Minn.).

*Blaschke–Mansfeldt* was the first of those, the Amended Complaint containing class action allegations having been filed in that case on March 31, 1989. du Pont has provided copies of that First Amended Complaint and of the later Complaint in *Monsaas*, Paragraph 4 of each of which contained these allegations:

---

**2.** That was the date on which Dr. Lagrotteria reported on the findings from Ganousis' December 1987 CT scan. In that report he indicated that Ganousis' left side implant would have to be removed because of fragmentation and local infection.

**3.** On that date Dr. Lagrotteria wrote Dr. Marcus stating that Cazares "may be having dissemination of the fractured portion of the implants."

Plaintiff brings this action on behalf of herself and all other individuals similarly situated:

(a) A Class Action is alleged pursuant to Minnesota Rules of Civil Procedure, Rule 23.

(b) The Class consists of all persons who now are or have been recipients of surgical implants of Vitek's Proplast TMJ Interpositional Implants, and who have suffered damage as a result of the implantation of the device.

Although that language could literally be read as though the putative class would encompass Illinois residents such as Ganousis and Cazares,[4] when the actual motion for class certification was filed later on in *Blaschke–Mansfeldt* plaintiff's counsel Zimmerman Reed said this (Mem. in Support of Class Certification 6):

Also, Plaintiff proposes that pursuant to Rule 23.02(4)(B) the class be limited to those plaintiffs residing in Minnesota at the time the defective implant was surgically placed in their body. Therefore, the class should be defined as follows:

(1) those who had the Proplast Interpositional implant surgically implanted in their jaw; and

(2) those who resided in Minnesota when the device was implanted in their jaw;

The class proposed is composed of recipients of the Proplast/Teflon Interpositional implant who resided in Minnesota at the time of receipt of the implant.

That limited definition was deliberately adopted for three reasons that were expressly urged by Zimmerman Reed at its Mem. 6–7 in *Blaschke–Mansfeldt:*

1. Choice of law problems that would be posed by a nationwide class would be avoided in favor of the across-the-board application of Minnesota substantive law.

2. Notice to Minnesota class members alone would be much easier to manage than any attempt at nationwide notice.

3. Statewide rather than any broader geographical certification would avoid interference with the many pending cases elsewhere.[5]

Meanwhile both *Monsaas* and *Dietz* had been removed to the federal district court. On April 20, 1990 the same plaintiff's counsel moved alternatively in *Monsaas* either (1) to stay Vitek's motion to dismiss the class action allegations or (2) to certify the case as a class action in reliance on the filings in *Dietz.* Just nine days earlier the same counsel had filed a like motion in *Dietz*—but the explicitly stated reason for the motion was the pending motion for certification in *Blaschke–Mansfeldt,* as to which counsel said:

Because of the pendency of this self-same Motion before State Court, Plaintiff Ann Dietz, and all other Plaintiffs in the Vitek, Inc. litigation in Federal Court, seek that the Motion to dismiss the class allegations be stayed pending resolution of the matter before Judge Burke [in *Blaschke–Mansfeldt* ]. Attached hereto and incorporated by reference are relevant portions of Moore's Federal Practice which describe the power of the Court to stay proceedings such as the Motion brought by Defendant Vitek, Inc. in this case.

### Issues for Decision

As stated earlier in this opinion, the most recent filing on behalf of Ganousis and Cazares has sharpened the focus of inquiry here. Their Supp.Mem. 6 says in part:

Finally, a state class would preclude interference with the many cases pending nationwide. There are at least 43 law firms handling Plaintiffs cases, some with as many as 60 cases. It would be imprudent to interfere with the progress of those cases. Inasmuch as all cases filed locally are identified, we believe, there is no jeopardy to any pending litigation.

---

**4.** It would of course be possible to read the allegation more narrowly, as embracing only Minnesota residents (given the citation to the Minnesota class action statute). But for purposes of this opinion (particularly the tolling principles referred to later on) the doubt will be resolved in favor of Ganousis and Cazares—they will be given the benefit of prospective inclusion in the proposed class.

**5.** As Zimmerman Reed's Mem. 7 in *Blaschke–Mansfeldt* said:

In short, Plaintiffs concede that the issue of class definition in Minnesota is dispositive here, if the discovery rule is applied. If the motion is the date at which tolling ceases, Plaintiffs' case would be dismissed under the discovery rule. If the order of the Court, as the authorities cited by Plaintiffs indicate, is the decisive date, the motion must fail.

That coupled with what plaintiffs' counsel had said earlier in that final Supplemental Memorandum has acknowledged that Ganousis and Cazares were out of time in filing their lawsuits (1) unless they can avoid the running of the statute of limitations altogether—at least until the actual removal of their respective TMJ implants—by virtue of what they misleadingly call the "continuing injury" doctrine or (2) unless the running of the statute of limitations was tolled until the entry of the order denying class certification in Minnesota, rather than merely until the filing of the class certification motion by counsel for Ganousis and Cazares (who were also counsel for plaintiffs in the Minnesota actions), in which they expressly specified that the putative class would include only Minnesota residents. All other potential grounds for escaping the limitations bar having thus been abandoned or waived by Ganousis and Cazares, this opinion will address only those two alternatives.[6]

### Resolution of the Issues
#### "Continuing Injury" or "Continuing Tort"?

■ . Counsel for Ganousis and Cazares have attempted to reshape the Illinois doctrine of the "continuing tort," as it applies in the limitations context, into something dramatically different from its actual nature. What Illinois (like other jurisdictions) has done in that respect—as is evident from the very cases that are cited at P.Supp.Mem. 2 and from the ensuing discussion of those cases in that Supplemental Memorandum—is to defer the limitations kickoff date, whenever a defendant has

regularly been exposed to hazardous chemicals or subjected to repeated injections of drugs or ingestions of chemical substances, to the date of last exposure.

But that "continuing tort" doctrine specifically does *not* apply to the situation where (as here) a defendant has been responsible only for a single allegedly tortious act (or even in situations where a defendant has engaged in more than one tortious act) and where (as here) the gravamen of the lawsuit stems from the latent effects of that act or those acts on the plaintiff's health. Indeed, that is the necessary teaching of the very case in which the Illinois Supreme Court announced the discovery rule to which this Court has referred in its May 1 and May 18 opinions (*Nolan v. Johns–Manville Asbestos,* also referred to earlier in this opinion) and of the contemporaneously decided *Witherell v. Weimer,* 85 Ill.2d 146, 52 Ill.Dec. 6, 421 N.E.2d 869 (1981).

If there were any room for doubt in that respect (and there is not), it is unquestionably dispelled by the clear statement in *Hyon Waste Management Services, Inc. v. City of Chicago,* 214 Ill.App.3d 757, 763, 158 Ill.Dec. 335, 338–39, 574 N.E.2d 129, 132–33 (1st Dist.1991) (emphasis added, most citations omitted):

> Where a tort involves a continuing or repeated injury, however, the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease. *A continuing violation, however, is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation.* Moreover, "where there is but one overt act from which subsequent damages may flow, it is held that the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature" of the injury. *Austin v. House of Vision, Inc.* (1968), 101 Ill.App.2d 251, 255, 243 N.E.2d 297.

---

**6.** This Court had tentatively prepared a calendar-type analysis of the respective tolling periods and non-tolled periods from the perspective of each party's litigating stance. In light of plaintiffs' concession quoted earlier in this paragraph of the text, this opinion has eschewed any such discussion.

Counsel's inattention to that decision (which merely repeats earlier well-established case law) as well as to the seminal decisions in *Nolan* and *Witherell* cannot be justified.

Let it be assumed purely for purposes of argument that du Pont is legally responsible for the unsuitability of its Teflon raw material for use in the Proplast TMJ implants in Ganousis' and Cazares' jaws. Still and all, those implants were one-time installations, not repeated exposures. And plainly the manner in which the Teflon-employing substance involved in that one-time installation may have functioned within Ganousis' and Cazares' bodies thereafter—the gestation period for the manifestation of their injuries—poses no different problem from the delayed manifestation of asbestos-related diseases after the plaintiff's acts of exposure to asbestos in *Nolan,* or from the delayed diagnosis of thrombophlebitis after the plaintiff's use of birth control pills in *Witherell,* or from the comparable delay between the single act that was charged to the City of Chicago and the complained-of manifestation of harm that flowed from that single act in *Hyon.*

Counsel's effort to twist a single or double implant that had incorporated du Pont's material into a continuing injury for limitations purposes distorts the concept of the "tortious act" as spoken of even in the cases on which Ganousis and Cazares seek to rely (see, e.g., *Meadows v. Union Carbide Corp.,* 710 F.Supp. 1163, 1165 (N.D.Ill. 1989), which refers to "when the tortious act ceases" and thus focuses on the time of the *defendant's* conduct and not on the date of its ultimate effect on the *plaintiff*). Hence Ganousis and Cazares can derive no comfort from this last-gasp assertion by their lawyers. It remains only to speak to the class-action tolling issue.

*Tolling of the Statute of Limitations*

These cases are indisputably controlled by a two-year limitations period. Under Ill.Rev.Stat. ch. 110, ¶ 13–202 that period begins after the cause of action "accrued." And as this Court has said in its May 1 and May 18 opinions, Illinois law applies a discovery concept to define the starting point for counting off that two-year period on the calendar (a doctrine exemplified by the Illinois Supreme Court's *Nolan* and *Witherell* decisions and recently explicated by our Court of Appeals in *Weger v. Shell Oil Co.,* 966 F.2d 216, 218 (7th Cir.1992) (per curiam)). Indeed, in product liability cases both the discovery rule and the two year time clock triggered by that rule have been codified in Ill.Rev.Stat. ch. 110, ¶ 13–213(d).

Thus under du Pont's approach each of Ganousis and Cazares was a bit more than a year late in meeting the statutory timetable after their respective discovery dates. Even more conclusively, on plaintiffs' own theory as to the relevant dates (once their mislabeled "continuing injury" notion has been dispensed with and the "continuing tort" concept has been shown not to apply) Ganousis was over 9 months late and Cazares was nearly 7 months late.

■ If it were not for the three Minnesota lawsuits referred to earlier, that would be the end of the matter. But a special timeliness rule applies where the defendant in an individual action has previously been the defendant in a putative class action and where the current individual plaintiff was within the proposed class definition. *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), as reconfirmed in *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), teaches that in that situation the otherwise operative limitations period is tolled during the entire time that the individual *may* have been embraced within the not-yet-certified class.

That tolling concept is grounded on a twofold notion of constructive notice:

1. As for defendants, the commencement of a class action is considered as providing notice (*American Pipe,* 414 U.S. at 555, 94 S.Ct. at 767):

not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within the period set by the statute of limitations, the

defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors.

2. As for the individual who has not been named as a plaintiff in the class action complaint, as soon as his or her claim can no longer be embraced within the putative class action, he or she is automatically deemed to be aware of that fact (*Crown, Cork & Seal,* 462 U.S. at 354, 103 S.Ct. at 2398). Based on that double fiction, the limitations clock stops ticking for the individual when the defendant is put on notice by the filing of the class action, and then it resumes ticking when the prospective plaintiff is put on notice of noncoverage in the class action—and therefore of being on his or her own.[7]

du Pont would first have it that the *American Pipe* doctrine does not apply to begin with—either because the Minnesota actions did not give du Pont the requisite information about the prospective claims (as the language quoted above from *American Pipe* had assumed would be the case) or because that scope of information is inherently lacking in the personal-injury-mass-tort context. Although those arguments appear to have some force and are buttressed by some respectable authority, they will not be addressed here. For one thing, at least in part they call for the exploration of uncharted waters in the seas of Illinois case law, an inappropriate task for a federal district court sitting in diversity (see, e.g., *Gust K. Newberg Construction Co. v. E.H. Crump & Co.,* 818 F.2d

1363, 1368 (7th Cir.1987); *Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1370 (7th Cir.1985)). But most importantly, they will not be dealt with here because they need not be—because even giving plaintiffs the benefit of the *American Pipe–Crown, Cork & Seal* rule, they lose.

■ If it were clear that none of the Minnesota actions had potentially included Ganousis and Cazares from the outset—if those actions had always been expressly framed as seeking to sue only on behalf of a class of Minnesota residents—*American Pipe* and *Crown, Cork & Seal* would have been of nothing more than academic interest (if that) in this case. No constructive notice to du Pont would ever have come into play in the first place to stop the ticking of the limitations clock as to non-Minnesota claimants such as Ganousis and Cazares. But the earlier-quoted language from the Minnesota complaints reflects that the plaintiffs there could at least be viewed as having begun with a more broadly-defined target: with what could be read like a nationwide class of recipients of Proplast implants.[8]

After that, however, the putative class was more narrowly labeled in the Minnesota cases. For reasons that they found good and sufficient, Zimmerman Reed (the same counsel who now represent plaintiffs here) unequivocally focused their sights as including within the proposed class *only* Minnesota residents—and thus as *excluding* all Proplast-implanted persons elsewhere, including Ganousis and Cazares. At that point both of the present plaintiffs were placed on legal notice that they could not look to the pending Minnesota actions to protect their interests and that they

---

**7.** *American Pipe*'s seminal decision dealt with tolling in the context of intervenors in the class action, while *Crown, Cork & Seal* applied that same principle to the later filing of individual actions by persons who would have been class members if class certification had taken place. Thus *Crown, Cork & Seal* is closer to the current situation than *American Pipe.* Nonetheless this opinion will follow the general practice of referring to the doctrine of *American Pipe,* where the more extended substantive discussion is to be found, rather than to *Crown, Cork & Seal.*

**8.** Plaintiffs' counsel in these cases would thus toll the entire period from the March 31, 1989 filing of *Blaschke–Mansfeldt* to the May 24, 1990 date on which certification was denied in that case (the other two Minnesota cases having staked their fate on the decision in *Blaschke–Mansfeldt*). That period of 1 year and 54 days would be enough to overcome the periods that need exclusion in these cases even under du Pont's calculation: 1 year and 1 day in *Cazares* and 1 year and 5 days in *Ganousis.*

would therefore have to go it alone by bringing their own lawsuits.

It must be remembered that the courts are dealing in fictions here—that the concepts on both sides involve constructive and not actual notice. In fairness such doctrines must be employed consistently, both when they are amiable fictions that benefit a plaintiff and when they rise up to bite the same plaintiff.[9] When a potential class action pending elsewhere—one of which a nonparty has no *actual* knowledge—operates (despite that lack of knowledge) to protect that nonparty by halting the running of limitations, the same principles teach that the nonparty is conclusively deemed to know the date on which class certification is denied, so that limitations begin to run again on that date.

And that latter concept applies even though in the real world that nonparty is obviously going to be just as ignorant of the date when the prospect of class treatment is no longer present as he or she has been of the existence of the other lawsuit to begin with. In just the same way that the putative class-action defendant is considered to be "on notice" of the possible future claim of an actually unknown potential plaintiff who fits the putative class description, that same potential plaintiff is considered to be placed "on notice" of *what* happens and *when* it happens in an entirely unknown lawsuit somewhere that might once have embraced him or her but that no longer does.[10]

That concept of the prospective class member being "on notice" of what takes place in a potential class action (even though it is unknown to him or her) that would otherwise benefit the putative class member must logically apply to *anything* that takes him or her out of the potential coverage of that action. To escape that vise, Zimmerman Reed seek to invoke the truism that only courts (and not plaintiffs or their lawyers) make the determination under Rule 23 that a case will or will not proceed as a class action. From that unexceptionable proposition they try to urge that the express limitation of the class requested for certification by Zimmerman Reed in the Minnesota actions—a limitation to Minnesota residents only—is of no moment.

But that is an obvious nonsequitur. Cases are of course legion in which courts have wholly denied motions for class certification for one reason or another. And in many other cases courts have whittled down the scope of the class sought to be defined by the class action lawyers.[11] But this Court knows of no case in which class counsel have asked permission to represent plaintiffs in an individual state, only to be forced by the court to expand their stable of clients to the entire United States. And if such a case *does* exist, it is surely of such rarity that no plaintiff would be justified in relying on his or her potential inclusion in a class where class counsel has expressly sought to *exclude* the group into which that plaintiff fits.[12]

---

**9.** In a different context this Court (concurring in part and dissenting in part in *Dickey-john Corporation v. International Tapetronics Corp.,* 710 F.2d 329, 351 (7th Cir.1983)) has spoken of a similar legal presumption of the all-seeing, all-knowing person:

It was the predecessor of the new Court of Appeals for the Federal Circuit that authored the charming conception of the prospective inventor surrounded by the prior art, *In re Winslow,* 365 F.2d 1017, 1020 (Cust. & Pat. App.1966):

We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him.

**10.** In terms of the inventor-and-prior-art metaphor referred to in n. 9, it is just as though the walls of the putative class member become instantaneously decorated by each successive pleading filed in each lawsuit that has been framed as a class action.

**11.** For example, earlier this year this Court's opinion in *Wesley v. GMAC,* 1992 WL 57948, at *3–4, 1992 U.S.Dist. LEXIS 3594, at *14–15 (N.D.Ill. Mar. 19, 1992), refused to certify a national class, ruling instead that the class should be limited to Illinois residents who had suffered the alleged harm from defendant's conduct in that case.

**12.** See Appendix.

It follows then that the Zimmerman Reed motion that specifically defined the prospective class in the Minnesota lawsuits to cover only Minnesota residents halted the *American Pipe–Crown, Cork & Seal* tolling period as to Ganousis and Cazares. That being so, Ganousis and Cazares have conceded that their actions here are barred by limitations.

### Conclusion

There is no dispute as to any of the facts that are material to du Pont's statute of limitations defense. Each of these actions is dismissed with prejudice as barred by limitations.

### Appendix

Although Zimmerman Reed have been of no help in providing any real research input for the area of analysis that is dealt with in the final paragraphs of this opinion,[1] this Court's law clerk Jeremy Feigelson has turned up one case that bears brief comment. In a widely publicized securities fraud class action, *Ross v. Warner*, 80 F.R.D. 88 (S.D.N.Y.1978), the plaintiffs' counsel had originally drafted their complaint by defining the proposed class in one way (covering securities purchases during a four-year period). Some months later the class counsel filed an amended complaint of much wider scope (covering a ten-year period of purchases instead)—and that was done without counsel's having to get court approval, because they were exercising the "one free bite" option that is available under Rule 15(a). That amendment expanded the potential class about tenfold (from some 90,000 to nearly 1 million).

About a year later the same plaintiffs' counsel sought leave of court to file still another amendment to the complaint, this one proposing to cover a different period of stock purchases altogether and thereby shrinking the prospective class back to about its original size (*Ross*, 80 F.R.D. at 91 says "This would represent the elimination of some 90% of the current class, or approximately 875,000 persons"). When he received that motion District Judge Charles Tenney voiced a serious concern about the possibility that a very large group of people who had formerly known themselves to be putative plaintiffs would be unaware that they were no longer such, so that the *American Pipe* doctrine would place them at peril if they failed to act promptly on their own. Consequently Judge Tenney required that the proposed shrinkage of the putative class had to be widely publicized before he would take the step of approving the proposed further amendment of the Complaint.

Three points should be made about *Ross:*

1. Judge Tenney did not at all consider the question that this Court has had to deal with here—he had no need to do so. Instead he simply assumed from the way in which the matter was presented—a motion to file an amended complaint—that the operative event for *American Pipe* purposes would be the granting of the motion to amend.

2. Even in those terms, however, Judge Tenney emphasized that he was not "now decid[ing] the propriety of certifying the newly narrowed class" (*Ross*, 80 F.R.D. at 92). Instead, he announced his intention to grant the motion to amend as soon as a notice had been published stating that the excluded persons "will henceforth be required to pursue their rights, if any, individually" (*id.*). In effect, then, his order contemplated that the proposed narrowing of the class by a choice exercised solely by plaintiffs' counsel, and *not* a later court order of certification of that narrower class, would be the event that halted the tolling effect of *American Pipe*.

---

1. It might be added that du Pont's counsel have not independently located any relevant cases either, contenting themselves instead with pointing out how obviously inapposite the cases sought to be relied on by Zimmerman Reed were to the issue before this Court (page 7 of du Pont's Memorandum Pursuant to May 18, 1992 Order, received today in this Court's chambers). That more limited treatment on du Pont's part is more understandable, however. It was after all plaintiffs' burden to demonstrate why the logical thrust of the *American Pipe* and *Crown, Cork & Seal* doctrine should *not* apply to bar their belatedly-filed lawsuits.

**158**

3. Moreover, Judge Tenney's stated concern was with the prospect that, given the very large public company whose stock was involved (General Telephone & Electronics Corp.) and the notoriety in the investing community of the lawsuit pending before him, there were very likely large numbers of prospective class members who had received *actual* notice and hence had placed *actual* reliance on their potential inclusion in that lawsuit (*id.* at 91, citation omitted):

The gravamen of the action questions whether GT & E's stock prospectuses, proxy material and other shareholder reports and solicitations "fairly and honestly describe[d] the improper transactions and business practices of GT & E and the improper and wrongful commercial bribes and political contributions" allegedly made in this country and abroad. Second Amended Complaint ¶ 4(D). Such serious and newsworthy allegations made against a huge corporation force the Court to consider the probability that many of the soon-to-be-abandoned class members received actual notice of the institution of this suit through national publicity and were perhaps deterred from instituting their own suits in reliance on their class membership. Equity dictates that these possible litigants not forfeit their rights for lack of knowledge that they are once again on their own.

As indicated earlier, *Ross* is the only case that has been located with a fact situation that also involved a narrowing adjustment in the class definition proposed by counsel for the prospective class—but nothing in the discussion there appears to provide guidance for this case, or if it does it supports the analytic route this Court has taken.

For one thing, it would of course be possible to liken the proposed amendment to the pleadings tendered in *Ross* to Zimmerman Reed's filing of their motion for a Minnesota-only class certification in the

Minnesota lawsuits. But even if such a parallel were drawn, the second point that has just been made about *Ross* tells us that Judge Tenney viewed the *class lawyers'* proposed narrowing definition of the prospective class, and *not* any later court order deciding on certification, as the event that restarted the limitations clock.[2] Moreover, nothing in this case has suggested that the institution or pendency of the Minnesota lawsuits created any meaningful amount of *actual* notice, and *actual* reliance of the kind spoken of by Judge Tenney, as contrasted with the fictions of constructive notice, and therefore of presumed reliance, that have been discussed in the text of this opinion. Perhaps most importantly, however, this Court has been required to focus *directly* on the legal issue as Judge Tenney had no occasion to do— and as already stated, this Court finds nothing in the *Ross* opinion to suggest a result different from that reached in this opinion.

---

**2.** That view of course is wholly consistent with both the view this Court has announced and the