985 P.2d 535

PASCO INDUSTRIES, INC., a Colorado corporation, Plaintiff–Appellee,

v.

TALCO RECYCLING, INC.; The National Polystyrene Recycling Company, L.P.; NPRC Management Corporation, Defendants–Appellants.

Pasco Industries, Inc., a Colorado corporation, Plaintiff–Appellee, Cross–Appellant,

v.

Amoco Foam Products Company; Talco Recycling, Inc.; The National Polystyrene Recycling Company, L.P.; NPRC Management Corporation; Polystyrene Packaging Council, Inc.; and Mobil Chemical Company, Defendants–Appellants, Cross–Appellees.

Nos. 1 CA–CV 96–0114, 1 CA–CV 96–0584.

Court of Appeals of Arizona, Division 1, Department E.

Nov. 27, 1998.

Reconsideration Denied Jan. 14, 1999.

Review Denied Sept. 21, 1999.

R. Stewart Halstead, P.C. by R. Stewart Halstead, Glendale, Attorney for Appellee/Cross–Appellant Pasco Industries, Inc.

Norris & O'Daniel, P.A. by David L. O'Daniel, Phoenix and Holleb & Coff by Robert K. Neiman, Chicago, Illinois, Attorneys for Appellants/Cross–Appellees National Polystyrene Recycling Company, L.P., NPRC Management Corporation, and Talco Recycling, Inc.

Howard & Rouse by Gary F. Howard, Phoenix, Attorneys for Appellant/Cross–Appellee Amoco Foam Products Company.

O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A. by Frank M. Fox, Christopher Robbins, Phoenix and Hogan & Hartson, LLP by Edward C. Druckers, Washington, D.C., Attorneys for Appellant/Cross–Appellee Mobil Chemical Company.

Bowman and Brooke by Thomas M. Klein, Christine L. Meyer, Phoenix, Attorneys for Appellant/Cross–Appellee Polystyrene Packaging Council, Inc.

## OPINION

TOCI, Judge.

¶ 1   As part of a nationwide effort by the plastic packaging industry to recycle used plastic goods, including polystyrene products, eight polystyrene producers formed a business, the National Polystyrene Recycling

Company, L.P. ("NPRC"), to operate polystyrene recycling plants throughout the United States. NPRC and Talco Recycling, Inc. ("Talco"), the operator of NPRC's plant in Corona, California, contracted with Pasco Industries, Inc. ("Pasco") to make Pasco the exclusive Arizona supplier of used and waste polystyrene products or "feedstock" to the Corona recycling plant. About a year after Pasco began operations in Arizona, NPRC and Talco terminated Pasco's exclusive contract.

¶ 2 Pasco sued NPRC, Talco, and the companies involved in NPRC for breach of contract and other contract claims. Pasco later added antitrust claims. At trial, the jury found for all defendants on the antitrust conspiracy claims, but found for Pasco on individual antitrust claims against some of the defendants and on breach of contract and interference with contract claims.

¶ 3 Following are the dispositive issues on appeal, as we view them, and our resolution of these issues:

1. Does substantial evidence support the jury's verdict that Amoco Foam Products Company ("Amoco"), Mobil Chemical Company ("Mobil"), NPRC, Talco, and the Polystyrene Packaging Council, Inc. ("PSPC") separately established, maintained, or used a monopoly in violation of Arizona Revised Statutes Annotated ("A.R.S.") section 44–1403 (1994)? No. NPRC did not possess monopoly power in the market for recycled polystyrene.

2. Does substantial evidence support the jury's finding of a flagrant violation of A.R.S. section 44–1403 and the award of treble damages? No. Even if Pasco had established NPRC's monopoly power in the relevant market, Pasco produced no evidence of willful maintenance or acquisition of that power.

3. Did NPRC breach the purchase agreement with Pasco? Yes. The meaning of the ambiguous contract language "estimated average" could properly be interpreted by the jury to mean that Pasco was to deliver an average of 50,000 pounds of feedstock per month over the three-year term of the contract. Interpreted that way, the jury could have found that be-

cause Pasco had the remainder of the term of the contract to comply with the average monthly tonnage, NPRC breached the contract by terminating Pasco for insufficient monthly production of feedstock.

4. Did Talco, NPRC's agent, tortiously interfere with Pasco's contract? No. As NPRC's agent, Talco was acting on behalf of NPRC and could not interfere with its own contract.

5. Was the breach of contract damages evidence too incompetent and speculative to support the award for lost future profits? No. Sufficient evidence in this record supports the award of $99,321.00 for lost future profits due to NPRC's breach of contract.

6. Did the trial court err in instructing that Pasco could recover both its alleged lost future profits and lost value of business on its breach of contract and monopolization claims? Yes. Under Arizona law, Pasco was not entitled to lost value of business.

7. Was Pasco the successful party and entitled to an award of attorneys' fees? No. Because we reverse the antitrust verdict, the attorneys' fees award must also be reversed.

Pasco presents one issue on its cross-appeal: Did the trial court err in crediting settlement amounts paid by other defendants to NPRC on the contract claim and Talco on the tortious interference claim? No. The amounts paid by settling defendants were properly offset against Pasco's judgment.

¶ 4 We therefore reverse the judgment in favor of Pasco on its A.R.S. section 44–1403 antitrust claim; reverse the tortious interference with contract claim against Talco; affirm the breach of contract verdict against NPRC and NPRC Management Corporation; affirm the award of breach of contract damages for lost profits but vacate the award for the lost value of Pasco's business; reverse the award of attorneys' fees and remand for reconsideration of that award; and affirm the credit for the settlement amount. Additionally, we deny Mobil's motion to strike Pasco's list of supplemental authorities. We have

considered the cited cases in reaching this decision.

## I. FACTS AND PROCEDURAL HISTORY

¶ 5   In the 1980s, environmental activists targeted plastic products, including polystyrene[1] products, as being environmentally undesirable because they were not biodegradable and were not being recycled. As a result, citizens pressured local and state governments to restrict or ban the use of plastics. In response, the plastic packaging industry lobbied for escape clauses in restrictive legislation that would rescind the restrictions if acceptable levels of plastics recycling could be demonstrated.

¶ 6   NPRC was formed in October 1989 as a Delaware limited partnership to own and operate polystyrene recycling centers throughout the United States. The limited partners in NPRC were Amoco Chemical Company, ARCO Chemical Company, Chevron Chemical Company, Dow Chemical Company, FINA Oil and Chemical Company, Huntsman Chemical Corporation, Kordite Corporation,[2] and Polysar Incorporated, all of which produced polystyrene. The general partner was NPRC Management Corporation, a close corporation; its shareholders were Dow Chemical Company, ARCO Chemical Recycling, Inc., FINA Oil and Chemical Company, Huntsman Recycling Corporation, Polysar Recycling, Inc./Novacor Recycling, Inc., Chevron Chemical Company, Mobil Polymers U.S., Inc./Mobil Plastics Recycling Corporation, and Amoco Materials Recovery Company.

¶ 7   Each NPRC limited partner made capital contributions in proportion to its respective virgin polystyrene resin sales volumes for the preceding calendar year. The maximum contribution per year was $1,300,-000.00. By 1992, the partners had contributed more than $49,000,000.00 to NPRC.

¶ 8   NPRC had recycling plants in Corona, California; Hayward, California; Chicago, Illinois; and Bridgeport, New Jersey. NPRC contracted with Talco to operate the Corona facility. The NPRC recycling plants took in post-consumer polystyrene and industrial scrap polystyrene to make recycled polystyrene resin in pellet form. NPRC obtained this used and scrap polystyrene feedstock from entities that collected and transported the feedstock to NPRC plants.

¶ 9   NPRC's goal was to recycle about 250 million pounds per year of post-consumer polystyrene and foam packaging by 1995. NPRC failed to meet its goal, however, and the cost to produce recycled resin was more than the price NPRC could charge to sell the resin. Thus, at the end of 1991, NPRC had an accumulated operating loss of $11,428,-000.00, and from January through April 1992, its net loss was $3,175,479.00.

¶ 10   In early 1991, Edwin Blesch, the president of Pasco, had discussions with representatives of Talco and Mobil about beginning a recycling program for polystyrene in Arizona. As a result of this and other such meetings, Pasco set up a polystyrene collection and consolidation program in the state. Polystyrene producers assisted Pasco by introducing Blesch to users of polystyrene food service products in Arizona and by making contributions to Pasco: Genpak Corporation ("Genpak") contributed $10,000.00, Winkler Flexible Products, Inc. ("Winkler") contributed $1,000.00, Amoco contributed $35,000.00, Scott Worldwide Food Service ("Scott") donated a polystyrene baler and office space and facilities, and Mobil leased a baler to Pasco and provided it with promotional materials. PSPC, a non-profit trade association comprised of companies involved in the polystyrene industry, contributed $25,000.00 and promotional materials.

---

1. Polystyrene is a lightweight plastic that is derived from petroleum and natural gas by-products. One recognizable type of polystyrene is foam, which is commonly referred to as "styrofoam"; "styrofoam," however, is a trademark name for Dow Chemical Company insulation board. Polystyrene foam is used in cups, bowls, plates, trays, clamshell containers, meat trays, and egg cartons, as well as in packaging for compact disks and for electronics and other delicate items. Polystyrene in a non-foam form is used for disposable cutlery, yogurt and cottage cheese containers, and clear clamshells.

2. Kordite Corporation is owned by Mobil Oil Corporation.

¶ 11 On July 31, 1991, Pasco and Talco, as agent for NPRC, entered a purchase agreement by which Pasco agreed to sell to Talco, "on a mutually exclusive basis," polystyrene materials sourced, collected, and shipped from Arizona. The term of the agreement was August 1, 1991 to July 31, 1994, with no provision for cancellation. The agreement provided that Pasco would deliver to NPRC's facility "polystyrene materials in estimated average minimum monthly quantities" of 50,000 pounds of post-consumer food service polystyrene foam and 5,000 pounds of expanded polystyrene foam protective packaging. Under the contract, Talco could reject at the loading dock any materials that did not conform to NPRC material specification requirements. Talco agreed to pay Pasco $.075 per pound for baled post-consumer polystyrene foam and $.10 per pound for baled polystyrene foam packaging that Pasco delivered to the NPRC plant.

¶ 12 Pasco contracted with seven school districts and a university to pick up their used polystyrene foam food service items. The schools paid Pasco to pick up the material; the fee was typically 1.25 to 1.50 cents for every meal served regardless of whether the polystyrene items used were sorted and picked up by Pasco or discarded into the garbage by students. Pasco then compacted and baled the waste polystyrene to be taken by truck to the Corona plant.

¶ 13 According to Pasco's records, from August 1991 to June 1992, it shipped 266,349 pounds of polystyrene to the Corona recycling plant—an average of 24,214 pounds per month. The NPRC–Corona plant records show that during that period, Pasco shipped 232,006 pounds of post-consumer polystyrene and 23,155 pounds of industrial waste polystyrene to the Corona plant.

¶ 14 In May 1992, representatives of NPRC asked Pasco to give up the exclusivity agreement so that another company could also deliver waste polystyrene from Arizona to the Corona plant. Pasco did not agree to waive the exclusivity provision. At about that time, Pasco informed NPRC that it could not continue in business over the summer and resume the school pickups in the fall unless NPRC participants contributed $38,-000.00 to Pasco to keep it in operation. If the recycling program participants were unable to contribute the $38,000.00, Pasco offered to assist the industry "in a transition for another company to take over."

¶ 15 By letter dated June 1, 1992, Talco informed Pasco that effective June 30, 1992, it was terminating the agreement with Pasco for sourcing, processing, and delivering post-consumer polystyrene materials from Arizona to the Corona plant. According to Talco, the contract termination resulted from "Pasco's continued failure or inability to meet the volume delivery requirements of the Purchase agreement." Talco was willing to consider purchasing post-consumer materials from Pasco after June 30, 1992, on a transaction-by-transaction basis. After June 30, 1992, however, Pasco did not send any materials to the NPRC recycling plant.

¶ 16 On August 26, 1992, Pasco filed its original complaint. It named as defendants NPRC, NPRC Management Corporation, Talco, PSPC, Amoco, Mobil, Scott, Genpak, James River Corporation ("James River"), Benchmark Holdings, Inc. dba Winkler Products, Inc. ("Benchmark"), Winkler, Wincup Holdings, Inc. ("Wincup"), and Jim and Jane Doe Stevenson dba Stevenson Sales. Pasco alleged that Talco/NPRC breached the July 1991 purchase agreement and the implied covenant of good faith and fair dealing when it terminated the agreement without justification. As a direct result of this breach, Pasco asserted, it was exposed to liability for its inability to perform under contracts it had entered, and it had suffered damages, including lost profits. Pasco brought negligent misrepresentation and estoppel claims against defendants, alleging that they supplied false information in assisting Pasco in developing and implementing the Arizona polystyrene recycling program.

¶ 17 Pasco later amended its complaint and in the third amended complaint additionally alleged that by reason of the joint enterprise between Pasco and defendants, there existed a fiduciary relationship that defendants breached. Pasco also added the allegation that all defendants "except the party that contracted with [Pasco] on the Tal-

co/NPRC contract" interfered with the contract and induced its breach.

¶ 18   In December 1994, Pasco filed its fourth amended complaint, in which it added a claim for illegal monopoly and restraint of trade in violation of A.R.S. sections 44–1402 (1994) and 44–1403.   Pasco alleged that NPRC Management's shareholders and NPRC's partners or their affiliates restrained recycled polystyrene production and sales to protect the prices and sales of virgin polystyrene and terminated the contract with Pasco to further that goal.   Pasco brought claims against Amoco, Mobil, NPRC, NPRC Management, and Talco for individually violating A.R.S. section 44–1403 and against those defendants and Benchmark, Winkler, PSPC, and Genpak for entering a combination or conspiracy to monopolize the recycled polystyrene trade or commerce in violation of A.R.S. section 44–1402.   Pasco alleged that the violations were flagrant and thus sought treble damages under A.R.S. section 44–1408 (1994).

¶ 19   The case was tried to a jury in May 1995[3].   Both at the close of Pasco's evidence and at the close of all the evidence, defendants moved for directed verdicts.   The trial court denied the motions.   On December 1, 1995, the jury returned the following verdicts:[4]

1.   For Pasco and against defendants NPRC and NPRC Management for breach of contract (Claim I) with damages of $99,-321.00 for lost future net profits and $165,-535.00 for lost value of the business, totaling $264,856.00;

2.   For all defendants and against Pasco for breach of fiduciary duty (Claim II);

3.   For Pasco and against Talco for tortious interference with contract (Claim III) with damages of $99,321.00 for lost future net profits and $165,535.00 for lost value of the business, totaling $264,856.00;   and for

Amoco, Mobil, and PSPC and against Pasco on Claim III;

4.   For all defendants and against Pasco for contract, combination or conspiracy to restrain trade and to monopolize trade in violation of A.R.S. section 44–1402 (Claims IV and V);

5.   For Pasco and against NPRC, Talco, Amoco, Mobil, and PSPC for establishment, maintenance or use of a monopoly to fix prices in violation of A.R.S. section 44–1403 (Claim VI) with damages of $99,-321.00 for lost future net profits and $165,-535.00, totaling $264,856.00;   and for NPRC Management and against Pasco on Claim VI. The jury trebled the damages against NPRC to total $794,568.00.

¶ 20   The court entered judgment according to the jury verdicts, less an offset of $120,000.00 for amounts paid by defendants that settled with Pasco before trial.   The court found that Pasco was the successful party and therefore was entitled to an award of costs and attorneys' fees pursuant to A.R.S. section 12–341.01 (1992).   Additionally, because an antitrust violation had been found, the court ruled that Pasco was entitled to an award of fees under A.R.S. section 44–1408.   The court awarded Pasco $12,-631.34 in taxable costs and $821,870.58 in attorneys' fees.

¶ 21   Defendants filed a number of postjudgment motions including motions for new trial, motions for judgment notwithstanding the verdict, and motions to amend the judgment.   The trial court denied all of the postjudgment motions and awarded additional attorneys' fees to Pasco.   NPRC, NPRC Management, Talco, PSPC, Mobil, and Amoco filed timely notices of appeal from the judgment and from the denial of a number of motions.   Pasco cross-appealed from the portions of the judgment that dismissed its claims;   from the amount of damages, fees, and costs awarded;   from provisions regard-

**3.**   Prior to trial, Pasco settled its case against Genpak, Benchmark, and Wincup, and they were dismissed from the action. The three companies paid Pasco $100,000.00 to settle its claims against them. Pasco also settled with James River for $15,000.00 and with Scott for $5,000.00.

**4.**   The "claims" set forth in the jury verdict forms are not the same as the counts in the Fourth Amended Complaint. Counts IV and V were dismissed before trial. The antitrust theories in Count VI, referred to as Count IV by the trial court, were separated into three claims and the term "claim" was used in the verdict forms.

ing the award of interest; and from the offset against the amount awarded to it.

## II. DISCUSSION

¶ 22 Defendants initially assert that Pasco did not have standing to pursue a monopolization claim under A.R.S. section 44–1403. Defendants argue that, as a matter of law, the only persons who would have standing to maintain an action for alleged monopolization to control, fix, or maintain prices are (1) customers who purchased material from defendants and therefore were directly affected by the alleged supracompetitive prices[5], or (2) competitors of defendants. According to defendants, as a supplier of feedstock, Pasco was neither a customer nor a competitor in the relevant market. We assume, solely for the purpose of argument, that Pasco does have standing and reach the merits of the case. Accordingly, we address the issue whether the evidence supported the antitrust verdict as well as the issues related to the breach of contract and tortious interference with contract claims.

## A. Does the Evidence Support the Antitrust Verdict?

■ ¶ 23 The success of Pasco's claim against defendants NPRC, Talco, Amoco, Mobil, and PSPC hinged on the exercise of monopoly power by NPRC. Pasco theorized that NPRC exercised monopoly power and that defendants Amoco, Mobil, PSPC, and Talco, because of their interest in NPRC, used its monopoly power to benefit them. The jury found for all defendants and against Pasco for contract, combination, or conspiracy to restrain trade and to monopolize trade in violation of A.R.S. section 44–1402. It found for Pasco and against NPRC, Talco, Amoco, Mobil, and PSPC for individual establishment, maintenance, or use of a monopoly to fix prices in violation of A.R.S. section 44–1403. We conclude, however, that there is no evidence in this record to support the finding that NPRC fixed prices through the use of monopoly power.

¶ 24 On defendants' claim of insufficient evidence to support the verdict, we will not reweigh the conflicting evidence but instead will examine the record to determine if there is substantial evidence to support the judgment. *Callender v. Transpacific Hotel Corp.*, 179 Ariz. 557, 562, 880 P.2d 1103, 1108 (App.1993). We must set aside a verdict if there is no substantial evidence in the record to justify it. *Styles v. Ceranski*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App.1996). The determination whether specific conduct was anticompetitive in violation of antitrust statutes is a question of law that we review *de novo*. *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368 (9th Cir. 1988).

### 1. Did NPRC Possess Monopoly Power in the Relevant Market?

¶ 25 Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize ... trade ... shall be deemed guilty" of an antitrust violation. Similarly, A.R.S. section 44–1403 provides that "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." Because § 2, like A.R.S. section 44–1403, prohibits monopolistic behavior by individual persons or entities—in other words, unilateral activity, *see Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 540–41 (9th Cir. 1991)—we analyze the requirements necessary to prove a violation of section 44–1403 under federal case law interpreting § 2 of the Sherman Act.

■ ¶ 26 To establish a claim for violation of § 2 of the Sherman Act, the plaintiff must prove two key elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acu-

---

**5.** Supracompetitive prices are prices above competitive levels. *Rebel Oil Co. v. Atlantic Richfield*

*Co.*, 51 F.3d 1421, 1434 (9th Cir.1995).

men, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

### a. What is the Relevant Market?

■ ¶ 27 A threshold requirement in a monopolization claim is to determine the relevant product and geographic markets. *Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 319 (5th Cir.1985). This is so because "the relevant market provides the framework against which economic power can be measured." *Id.* (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir.1978)). A "market" is defined as "any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers.... Stated differently, a 'market' is the group of sellers or producers who have the 'actual or potential ability to deprive each other of significant levels of business.'" *Rebel Oil*, 51 F.3d at 1434 (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir.1989)).

¶ 28 Both market definition and whether market power exists are essentially questions of fact. *Oahu Gas*, 838 F.2d at 363. Here, the jury was instructed that Pasco contended that the relevant markets were the resin market in the United States, which includes recycled polystyrene resin and virgin polystyrene resin, and the post-consumer polystyrene feedstock market in the western United States. By its verdict in favor of Pasco on the A.R.S. section 44–1403 claim, the jury necessarily accepted Pasco's claim that these were the relevant markets.

¶ 29 According to Pasco's answering brief, NPRC had a monopoly in just one market—the supply market of recycled polystyrene—and it used that monopoly to affect prices in the market for virgin polystyrene resin. For the purpose of reaching the issue of monopoly power, we address this argument, although it is somewhat different than Pasco's theory in the trial court. The evidence Pasco cites to support its contention on appeal is that (1) NPRC had a share of at least 80 to 90 percent of the recycled polystyrene market, (2) there were significant barriers to entry in the market, (3) the prices of recycled polystyrene were static, (4) a used polystyrene supplier stated that there was no other company to sell to, (5) NPRC represented itself as the only recycler, and (6) Talco acknowledged that it had no competitors.

### b. Did NPRC Possess Monopoly Power?

■ ¶ 30 Thus, the dispositive issue is whether NPRC possessed monopoly power in the supply market of recycled polystyrene. Monopoly power is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Market power may be shown by either of two types of proof. *Rebel Oil*, 51 F.3d at 1434. To prove that NPRC had monopoly power, Pasco had to either provide direct evidence of restricted output *and* supracompetitive prices, or provide circumstantial evidence by defining the relevant market, proving that NPRC owned a dominant share of that market, showing that significant barriers hindered entry into the market, and establishing that existing competitors lacked the capacity to increase their output in the short run. *Id.*

### (1) Did Pasco Establish Monopoly Power by Direct Evidence that NPRC Restricted Output and Charged Supracompetitive Prices?

¶ 31 Pasco attempted to show at trial that NPRC tried to restrict output of recycled polystyrene resin in the western United States by terminating Pasco's exclusive contract to supply post-consumer polystyrene products from Arizona. Assuming for the purpose of discussion that Pasco produced direct evidence of restricted output of recycled polystyrene resin, to establish monopoly power Pasco was required to produce direct evidence of supracompetitive prices. Pasco points us to no evidence that NPRC charged supracompetitive prices for the recycled resin it produced. In fact, the only evidence cited on the subject cuts against that conclusion.

¶ 32 Pasco produced evidence that the price of the recycled post-consumer polysty-

rene sold in pellet form stayed at 44.5 cents per pound from January 1993 to at least February 1995. The 44.5 cent figure was an industry-wide pricing average, however, not the price charged by NPRC. The average price (derived from Exhibit 517) for sales of post-consumer flake and pellet resin combined during that time period was about 38 cents per pound. The average price NPRC received for the post-consumer polystyrene resin it sold in 1993 was 17 cents per pound, and in 1994, the average price was 29 cents per pound. Even in 1992, the year in which NPRC terminated Pasco's exclusive contract, the industry-wide monthly average price for post-consumer resin—flake and pellet forms—ranged from 34.50 to 39.25 cents per pound while NPRC's average price was 19 cents per pound. Clearly, then, NPRC was not charging supracompetitive prices for its recycled resin, either before or after it terminated Pasco's contract. Accordingly, Pasco failed to prove monopoly power by direct evidence of restricted output and supracompetitive prices.

## (2) Did Pasco Establish Circumstantial Evidence of NPRC's Monopoly Power?

¶ 33  We next turn to whether Pasco proved circumstantially that NPRC had monopoly power in the recycled polystyrene resin market. As we observed above, to demonstrate market power circumstantially, a plaintiff must (1) define a relevant market, (2) show that defendant owns a dominant share of the market, (3) show that there are significant barriers to entry, and (4) establish that existing competitors lack the capacity to increase their output in the short run. *Rebel Oil,* 51 F.3d at 1434. For the purpose of argument, we have accepted Pasco's assertion on appeal that the monopolized market was the supply market of recycled polystyrene. Before we address whether defendants controlled a dominant share of this market, we consider whether Pasco established the third and forth elements of circumstantial proof of monopoly power: significant barriers to entry and lack of capacity by existing competitors to increase their output in the short run.

## (a) Did Pasco Establish Entry Barriers and the Inability of Competitors to Increase Their Output?

■  ¶ 34  Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1427–28 (9th Cir.1993) (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 409, at 509–10 (Supp.1992)). Among entry barriers are higher capital costs imposed on new entrants and economies of scale. *Rebel Oil,* 51 F.3d at 1439. To justify a finding that a defendant has the power to control prices, the entry barriers must be so significant that they are capable of constraining the normal operation of the market to such an extent that the problem is unlikely to be self-correcting. *Id.*

¶ 35  Defendants presented uncontroverted evidence that the partners in NPRC had to pour millions of dollars into the NPRC recycling plants and system to initiate the business and to keep it going. This evidence of the high start-up costs and the poor prospect for profit-making shows that barriers existed to others entering the polystyrene recycling market.

¶ 36  As to the ability of NPRC's competitors to increase output in the short run, however, neither Pasco nor defendants presented any evidence on this question. The evidence showed that NPRC had competitors nationwide, but the competitors' capacity to increase output was not addressed. Because this element is necessary to a determination whether NPRC had monopoly power, and Pasco presented no proof in this regard, we must presume that this element does not support the contention that NPRC had monopoly power.

## (b) Did Pasco Establish that NPRC Owned a Dominant Market Share?

¶ 37  Exhibits in evidence, including studies done at the request of entities not involved in this case, specifically established

that NPRC had less than a majority share of the market. A study done for the Partnership for Plastics Progress showed that an estimated 24,300,000 pounds of post-consumer polystyrene were recycled in the United States in 1991. Another study, one prepared for the American Plastics Council, showed that in 1992, 37,300,000 pounds of post-consumer polystyrene were recycled. Other uncontroverted evidence showed that NPRC purchased 8,300,000 pounds of post-consumer polystyrene feedstock in 1991 and 13,800,000 pounds in 1992. The evidence thus demonstrated that in 1991, NPRC recycled about 34 percent of the polystyrene that was recycled in the United States, and in 1992, it recycled about 37 percent.[6]

¶ 38   Pasco does not point us to any substantial evidence about the size of the markets and NPRC's dominant share of those markets. It cites evidence that NPRC's own document identified it as "the first network of polystyrene foam recycling centers" and as "a unique cooperative venture by the polystyrene industry to develop a nationwide infrastructure for the collection and recycling of post-consumer polystyrene and the marketing of recycled resin." The fact that the recycling centers were part of a network and nationwide infrastructure, however, does not necessarily mean that NPRC dominated the market.

¶ 39   Pasco cites the testimony of Russell Welton, NPRC's vice president, that it was his guess that in 1991, NPRC had 80 to 90 percent of the nationwide business of acquiring post-consumer polystyrene and recycling it. Notwithstanding, Welton also stated that, as to the actual pounds of recycled or reprocessed polystyrene, he believed NPRC's share would be significantly less than 80 percent of the market.

¶ 40   Ivan Braverman, Pasco's expert witness, testified that he believed that NPRC was a monopoly in post-consumer recycling based on a document prepared by Jose Granda, a president of NPRC Management, which stated that NPRC was the only real consumer recycler. Braverman also based his opin-

ion on Welton's testimony discussed above. On cross-examination, however, Braverman agreed that the entire statement from the Granda document indicated that instead of just taking the "easy" materials, NPRC recycled all kinds of post-consumer materials. He also agreed that the document did not show that NPRC was the only post-consumer recycler because it also referred to other polystyrene recyclers.

¶ 41   Pasco also cites the testimony of F.W. Bowmar, Jr., who had a business that he believed was the only one in Arizona in 1995 that picked up only used polystyrene. Pasco represents that Bowmar testified that he knew of no purchaser of feedstock in the western United States other than NPRC. In fact, Bowmar testified that a company named Dalco, which had plants in Texas and Washington, bought post-consumer polystyrene feedstock. He also testified that he had recently learned of a company that bought post-consumer plastics with which he intended to do business.

¶ 42   Numerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish monopoly power. *E.g., Rebel Oil*, 51 F.3d at 1438 (citing *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 528 (5th Cir.1982); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1274 (9th Cir.1975)). We therefore conclude that a dominant share for the purpose of circumstantially showing monopoly power would have to be at least 50 percent of the market. We need not weigh any evidence to reach the conclusion that NPRC did not have a majority share of the post-consumer polystyrene recycling business in the United States. The evidence shows that NPRC had less than a 50 percent share. Thus, Pasco failed to produce substantial circumstantial evidence to prove that NPRC dominated the market for recycling of post-consumer polystyrene.

**2. Did Pasco Establish that NPRC Willfully Acquired and Maintained Monopoly Power?**

■   ¶ 43   Even if Pasco had established that NPRC had monopoly power, we con-

---

**6.** These percentages were calculated by comparing the amount of feedstock that NPRC purchased with the amount of polystyrene recycled

as shown in Exhibits 508 and 509. Defendants assert that NPRC's market share was less: 14 percent in 1991 and 25 percent in 1992.

clude that the evidence fails to establish the second major part of the test: the willful acquisition and maintenance of such power. "The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 739 (9th Cir.1985). The mere possession of monopoly power does not condemn a market participant as long as the participant refrains "from conduct directed at smothering competition." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir.1979).

¶ 44 Pasco produced no evidence that NPRC did anything to restrict or smother competition. Pasco argues that NPRC excluded competition by rendering its capital-intensive recycling plants unprofitable so that others would be discouraged from entering the market. Pasco cites no evidence, however, that NPRC intentionally rendered its recycling business unprofitable to keep others out of the market. In fact, Bowmar testified that NPRC subsidized its recycling plants because polystyrene recycling was not economical. He explained that big companies may recycle polystyrene for social reasons but not for financial reasons because plastic has never been of value as a waste commodity.

¶ 45 Pasco argues that the termination of its contract was part of NPRC's plan to cut down on the amount of sourcing so that there would be less recycled resin to sell and NPRC could therefore charge more for virgin resin. We find no evidence in this record that supports Pasco's argument. As noted above, the evidence Pasco cites shows instead that NPRC was trying to increase sourcing, but it wanted the increase to be in types of polystyrene that were easier and more economical to recycle than used food service products. NPRC also explored strategies to keep its losses as low as possible.

■ ¶ 46 Furthermore, even if in fact NPRC decided to cut the amount of recycled resin it was producing, a decision to reduce or forego production of a product is not an illegal act *per se*. *Oahu Gas*, 838 F.2d at 368. Even if the decision acts to exclude competition, that conduct does not constitute

willful acquisition or maintenance of monopoly power if the decision is based, at least in part, on a legitimate business justification or economic necessity or rationale. *Id.* The antitrust laws "do not require a business to cut its own throat." *Dehydrating Process Co. v. A.O. Smith Corp.*, 292 F.2d 653, 657 (1st Cir.1961).

¶ 47 Accepting Pasco's argument would lead to the conclusion that the antitrust laws require a business that has a monopoly share in a market to continue in business even if it is losing money and wishes to close down. Obviously, this is not the intent of the antitrust laws, even if the closing of the business would enable prices in a related market to be raised.

■ ¶ 48 Finally, Pasco's antitrust claim fails because the antitrust laws are intended to prevent injury to the market, not to individual firms. *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1373 (9th Cir.1983). These laws are not designed to reach all business practices, unfair or not, that are damaging to individual companies. *Id.* at 1374. Part of Pasco's argument is that once the environmental outcry about polystyrene products died down, NPRC cut its efforts to source post-consumer food service feedstock and that conduct drove Pasco out of business. Even if Pasco is correct in this contention, it was not a competitor of NPRC, and any damage it suffered from this scheme was not a result of an antitrust violation.

¶ 49 Pasco failed to produce evidence to establish that NPRC was a monopoly illegally established, maintained, or used by it and the other defendants. Thus, even if Pasco had standing to bring an antitrust claim, the evidence does not support a verdict against any of the defendants for violating A.R.S. section 44–1403. We therefore reverse the denial of that portion of defendants' motion for judgment notwithstanding the verdict related to this issue and remand for entry of judgment in favor of defendants on Claim VI.

**B. Did NPRC Breach Its Contract with Pasco?**

■ ¶ 50 NPRC terminated Pasco's exclusive agreement for "Pasco's continued fail-

ure or inability to meet the volume delivery requirements of the Purchase agreement." NPRC and NPRC Management argue on appeal that Pasco materially breached its contract with NPRC by failing to meet the minimum monthly average delivery requirements set forth in the agreement and that this breach justified cancellation of the contract. We conclude that the language of the contract is ambiguous. Because Pasco produced evidence that the minimum monthly requirement was not expected by the parties to be met in the first year but instead was a minimal monthly average over the three-year period of the contract, substantial evidence exists in the record to support the verdict in favor of Pasco.

¶ 51 Whether a contract is ambiguous is a question of law. *The Hartford v. Industrial Comm'n,* 178 Ariz. 106, 111, 870 P.2d 1202, 1207 (App.1994). The relevant portion of the agreement provides that Pasco would deliver to NPRC's Corona plant "polystyrene materials in estimated average minimum monthly quantities" of 50,000 pounds of post-consumer food service polystyrene foam and 5,000 pounds of expanded polystyrene foam protective packaging. We find this provision to be ambiguous because of the words "estimated average." This wording could be interpreted to support NPRC's argument that Pasco was required to deliver 55,000 pounds every month of the contract, but it also could be interpreted to support Pasco's proffered meaning.

¶ 52 If a contract is ambiguous, the parties may offer evidence to help interpret it, and the construction thus becomes a question for the jury. *Hall Family Properties, Ltd. v. Gosnell Dev. Corp.,* 185 Ariz. 382, 388, 916 P.2d 1098, 1104 (App.1995). The parties here offered evidence of their understandings and agreements concerning the meaning of the delivery requirements. The jury apparently accepted Pasco's evidence that the contract called for a monthly average of 55,000 pounds over the course of the three-year contract. It thus could have properly found that Pasco did not materially breach the contract by delivering less than 55,000 pounds per month since the average monthly amount would not necessarily be known until

the term of the contract expired. Under the latter construction, NPRC breached the contract when it terminated Pasco's exclusive rights short of the three-year term. Accordingly, we affirm the verdict that NPRC and NPRC Management breached the contract.

## C. Did Talco Tortiously Interfere with Pasco's Contract?

¶ 53 The jury rendered a verdict against only Talco for tortious interference with contract; it found for defendants Amoco, Mobil, and PSPC and against Pasco on this claim. Talco argues that because it acted as NPRC's agent in terminating the contract, it cannot be liable for tortious interference. We agree.

¶ 54 The elements of a cause of action for intentional interference with contract are (1) a contract between the plaintiff and a third party, (2) knowledge of the defendant that the contract exists, (3) intentional interference by the defendant that caused the third party to breach the contract, (4) a showing that the defendant acted improperly, and (5) a showing that damage resulted to the plaintiff. *Barrow v. Arizona Bd. of Regents,* 158 Ariz. 71, 78, 761 P.2d 145, 152 (App.1988). Given these elements and the posture of Pasco's tortious interference claim, we conclude that this claim should not have gone to the jury.

¶ 55 The contract at issue clearly states in its heading that it is a "Purchase Agreement Between Talco Recycling, Inc., Agent for The National Polystyrene Recycling Company, L.P., and Pasco Industries, Inc." The body of the contract also states that the agreement is between Talco, agent for NPRC, and Pasco. The termination letter is on stationery of "Talco Recycling, Inc., An NPRC Facility" and is signed by Philip M. Fusco, the vice president and general manager of Talco. NPRC authorized the cancellation of the purchase agreement, and Talco canceled the contract on NPRC's behalf. The jury was instructed that NPRC had conceded that Talco was its agent in entering the purchase agreement, that NPRC was bound by the agreement, and that NPRC authorized the termination of the agreement.

¶ 56 The tortious interference claim as pled is not against Talco. It is against all defendants "except the party that contracted with [Pasco] on the Talco/NPRC contract," which is clearly identified in the contract as Talco, agent for NPRC. Pasco alleged that these defendants knew of the contract and the relationship between Pasco and the owner and operator of the Corona recycling plant. The owner of the plant was NPRC and the operator was Talco. Talco therefore could not have been one of the defendants against whom this claim was made.

¶ 57 Pasco's interference with contract claim against Talco thus fails on the first element of the tort because the contract was not between Pasco and a third party; the agreement was between Pasco and Talco itself, as agent for NPRC. Pasco specifically recognized this fact in the interference with contract claim in the fourth amended complaint. In addition, the jury was instructed that Pasco had to prove that a particular defendant must have "interfered with Pasco's contractual relationship with NPRC (Talco)."

¶ 58 Pasco cites evidence that Talco tried to hire Pasco's employees, interfered with Pasco's attempt to recruit Arizona Public Service, and interfered with deliveries from Scott. Pasco, however, does not demonstrate how any of these acts caused a third party to terminate the contract. Therefore, even if Talco were acting independently and not as NPRC's agent in the cited conduct, Pasco presented no evidence that these acts caused the breach of the contract. These acts could not have caused a third party to breach the contract because there was no third party; the contract was with Talco itself.

¶ 59 We reverse the denial of Talco's motion for judgment notwithstanding the verdict related to the tortious interference with contract claim and remand for entry of judgment in favor of Talco on this claim.

## D. Are the Breach of Contract Damages Legally Valid and Supported by the Evidence?

¶ 60 The jury calculated Pasco's breach of contract damages against defendants NPRC and NPRC Management as $99,321.00 for lost future net profits and $165,535.00 for lost value of the business. Defendants argue that these damages are not supported by the evidence, that the damages testimony of Pasco's expert witness, Ivan Braverman, was incompetent and based purely on speculation, and that Pasco was not entitled to damages for lost value of the business. We conclude that although Pasco is not entitled to damages for lost value of the business, the verdict for lost future net profits is supported by substantial evidence.

¶ 61 NPRC argues that Arizona's version of the general and sales provisions of the Uniform Commercial Code ("U.C.C.")—A.R.S. sections 47–1101 through 47–2725 (1997)—governs the types of damages Pasco may recover for any alleged breach of its supply contract. Under these statutes, NPRC argues, a supplier such as Pasco may not recover loss of business value as damages for breach of a supply contract. It cites A.R.S. section 47–1106(A), which provides that consequential damages may not be had under title 47 except as specifically provided in the title or by other rule of law, and A.R.S. sections 47–2703, 47–2708, and 47–2709, which provide for damages for price or net profit when a buyer wrongfully rejects or revokes acceptance of goods.

¶ 62 Both NPRC and Pasco are merchants as defined in A.R.S. section 47–2104.[7] Installment contracts are governed by Arizona's version of the U.C.C. *See Autonumerics, Inc. v. Bayer Indus., Inc.*, 144 Ariz. 181, 186, 696 P.2d 1330, 1335 (App.1984) (agreement to supply twenty-six numerical controls that allegedly was breached when buyer refused to buy more than one was

---

**7.** A.R.S. section 2104(A) defines "merchant" as follows:

Merchant means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practice or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

governed by Arizona's version of U.C.C.). Under A.R.S. section 47–2612(A), "an 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted...." The purchase agreement between Talco/NPRC and Pasco provided that Pasco would deliver to NPRC's facility "polystyrene materials in estimated average minimum monthly quantities" and that Talco could reject at the loading dock materials that did not conform to NPRC material specification requirements. We conclude that the purchase agreement meets the definition of an installment contract under this statute.

¶ 63 Section 47–2708 controls the issue of damages for NPRC's breach of contract. That section provides that the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price and the unpaid contract price together with any incidental damages provided in A.R.S. section 47–2710. Or, if that measure of damages is inadequate to put the seller in as good a position as performance would have, then the measure of damages is the profit the seller would have made from full performance by the buyer together with incidental damages.

■■■ ¶ 64 Incidental damages do not include damages for loss of the value of the business. *See* A.R.S. § 47–2710. Therefore, under this statutory scheme, Pasco was entitled only to damages for its lost profits. Accordingly, we reverse the damages awarded for lost value of the business.

¶ 65 Defendants argue that Braverman's testimony does not support the verdict because it was incompetent and based purely on speculation. We need not address this argument, however, because the jury obviously rejected Braverman's calculation of damages. Braverman calculated Pasco's loss of profit and loss of business value damages at about $5,000,000.00; the jury's total award of $264,856.00 bears no relation to that figure.

■■■ ¶ 66 In calculating lost profit damages, "[o]nce the fact of damages has been proven, the amount of the damages may be shown with proof of a lesser degree of certainty than is required to establish the fact of damage." *Short v. Riley,* 150 Ariz. 583, 585, 724 P.2d 1252, 1254 (App.1986). The evidence must show a reasonable basis for the trier of fact to fix computation when a dollar loss is claimed. *Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.,* 140 Ariz. 174, 184, 680 P.2d 1235, 1245 (App.1984). While absolute certainty is not required, the jury must be guided by some rational standard in making an award. *Id.*

■■■ ¶ 67 We cannot tell from the evidence cited to us how the jury arrived at the figure of $99,321.00 for lost future profits. We note, however, that the evidence showed that the fees paid by the school districts for pick-up of used polystyrene covered Pasco's costs of operation and that the amount paid by Talco for the materials under the contract was 7.5 cents per pound for post-consumer food service products and 10 cents per pound for foam packaging material. If Pasco had delivered an average of 50,000 pounds per month of post-consumer food service products for the remaining twenty-five months of the contract, it would have received $93,-750.00 from Talco/NPRC. Deliveries of an average of 5,000 pounds per month of foam packaging material over the remaining contract period would have resulted in an additional $12,500.00, for a total of $106,250.00. The $99,321.00 awarded for lost profits is in the range between the amounts that would have been payable under the contract for food service products and for all products and thus is a reasonable and rational award. Accordingly, we affirm the award of $99,-321.00 for breach of contract damages.

## E. Were Excessive Attorneys' Fees Awarded to Pasco?

¶ 68 The trial court awarded Pasco $821,-870.58 in attorneys' fees in the initial judgment. It subsequently awarded Pasco an additional $15,504.00 in attorneys' fees. Defendants argue that the trial court erred in failing to apportion the fees so that Pasco's award would be based only on its successful claims.

¶ 69 Because we are reversing the antitrust verdict on which the treble damages award is based, the question of attorneys'

fees must be revisited by the trial court. Pasco has now prevailed only on the breach of contract claim against NPRC and NPRC Management. Attorneys' fees may be awarded only for those fees attributable to that claim, in the trial court's discretion, under A.R.S. section 12–341.01(A).

¶ 70  Determining a maximum amount for the fees award attributable to the successful breach of contract claim should not be difficult. Under A.R.S. section 12–341.01(B), fees awarded in an action arising out of contract "may not exceed the amount paid or agreed to be paid." Thus, if, as defendants assert, Pasco has a 40 percent contingency fee agreement with its attorneys, its attorneys' fees award must be limited to 40 percent of the amount it is awarded on the breach of contract claim. *See Marcus v. Fox*, 155 Ariz. 524, 525–26, 747 P.2d 1223, 1224–25 (App.1987); *Continental Townhouses East Unit One Ass'n v. Brockbank*, 152 Ariz. 537, 545, 733 P.2d 1120, 1128 (App. 1986).

¶ 71  Accordingly, we reverse the attorneys' fees awards in favor of Pasco and remand for a determination of fees based solely on Pasco's successful breach of contract claim. The award of fees, if any, should be against NPRC and NPRC Management only.

### III.  CROSS–APPEAL

**Did the Trial Court Err in Crediting the Settlement Amounts Received from Three Defendants to NPRC on the Contract Claim and Talco on the Tortious Interference Claim?**

¶ 72  Three of the original defendants in this case settled with Pasco before trial for a total of $120,000.00. The trial court credited that amount against the judgments against NPRC and Talco on the breach of contract and interference with contract claims. Pasco argues that this credit was erroneous because the settling defendants were not involved in the breach of contract action against NPRC. We disagree.

¶ 73  This issue was addressed in *American Home Assurance Co. v. Vaughn*, 21 Ariz. App. 190, 517 P.2d 1083 (1974). There, the court reasoned that the critical question was whether the plaintiff was suing several defendants to redress one wrong. *Id.* at 192, 517 P.2d at 1085. The court held that "when a plaintiff, seeking to recover damages arising out of one incident or transaction, alleges an alternate theory of recovery as to each of several defendants, a settlement by one or more of the defendants is to be credited against any judgment rendered against the defendant who is held liable." *Id.* at 193, 517 P.2d at 1086.

¶ 74  Here, Pasco sought to recover damages that arose out of one incident—the termination of its purchase agreement with Talco/NPRC. Although its alternate theory of recovery against some of the defendants was the antitrust claim, its damages were still based on the injury it suffered due to the breach of the contract. Pasco did not allege a series of wrongs with different defendants responsible for different wrongs that resulted in different damages. There was only one incident and one injury. Hence, the trial court correctly applied the settlement amount against the award made at trial in favor of Pasco.

### IV.  CONCLUSION

¶ 75  In summary, we reverse the denial of defendants' motions for judgment notwithstanding the verdict on the antitrust claim under A.R.S. section 44–1403 (Claim VI) and remand for entry of judgment on this claim in favor of NPRC, Talco, Amoco, Mobil, and PSPC. As a result, we also reverse the treble damage award against NPRC for a flagrant violation of the antitrust statute.

¶ 76  We affirm the breach of contract verdict against NPRC and NPRC Management as well as the award of $99,321.00 to Pasco for lost future net profits. We vacate the award of $165,535.00 for lost value of the business. In addition, we reverse the verdict against Talco for tortious interference with contract and remand for entry of judgment on this claim in favor of Talco.

¶ 77  Because of the reversal of some of the claims that were in favor of Pasco, we reverse the award of attorneys' fees to Pasco and remand for the trial court's consideration of an award of fees based only on Pasco's

successful breach of contract claim. We affirm the trial court's credit of the settlement amount against the amount awarded to Pasco.

¶ 78  In the exercise of our discretion, we decline to award any party its attorneys' fees incurred in this appeal. Although no party has entirely prevailed on appeal, defendants have substantially prevailed. Therefore, we award them their costs on appeal upon compliance with Rule 21 of the Arizona Rules of Civil Appellate Procedure.

CONCURRING: EDWARD C. VOSS, Judge, and THOMAS C. KLEINSCHMIDT, Judge.