### In re MICROSOFT CORP. ANTITRUST LITIGATION

#### No. MDL 1332.

United States District Court,
D. Maryland.

June 6, 2003.

---

### OPINION

MOTZ, District Judge.

Microsoft has filed a motion for partial summary as to plaintiffs' "essential facility" and "monopoly leveraging claims."[1] The motion will be granted in both respects.

#### I.

 Plaintiffs allege that "the specifications for ... [the] Windows" operating system constitute an essential facility and that Microsoft "refus[ed], limit[ed] and manipulat[ed] its actual and potential competitors' access to the specifications while preferentially or freely granting itself such access." Compl. ¶¶ 144–45. More specifically, plaintiffs allege that Microsoft, having unlawfully maintained a monopoly in the Intel-compatible PC operating system market, was under a duty to disclose to independent software developers ("ISVs") information about how applications programming interfaces ("APIs") worked.

Microsoft first argues that the claims based upon this allegation fail as a matter of law because "the essential facilities doctrine has never been and should not be applied in a case such as this one involving technological innovations or information." (Def.'s Mem. at 10.) Microsoft has cited various cases in support of this proposition. *See, e.g., California Computer*

---

1. Plaintiffs asserted such claims in Count V, VI, and VII, relating, respectively, to word processing software, spreadsheet software, and office suite software. In their memorandum opposing Microsoft's motion, plaintiffs have indicated that they are voluntarily dismissing Count VII.

*Prods., Inc. v. Int'l Bus. Machines Corp.,* 613 F.2d 727, 744 (9th Cir.1979); *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 761 F.Supp. 185, 192 (D.Mass.1991); *ILC Peripherals Leasing Corp. v. Int'l Bus. Machines Corp.,* 458 F.Supp. 423, 437 (N.D.Cal.1978), *aff'd per curiam,* 636 F.2d 1188 (9th Cir.1980). None of these cases, however, involves a defendant who, like Microsoft, has violated section 2 of the Sherman Act by unlawfully maintaining a monopoly in the market in which it has developed the technology alleged to constitute the essential facility.[2]

Nevertheless, I find Microsoft's argument to be persuasive. As Microsoft points out, to require one company to provide its intellectual property to a competitor would significantly chill innovation. *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 281–82 (2d Cir.1979); *Data Gen. Corp.,* 761 F.Supp. at 192; *GAF Corp. v. Eastman Kodak Co.,* 519 F.Supp. 1203, 1228 (S.D.N.Y.1981); *ILC Peripherals,* 458 F.Supp. at 437. Moreover, because the software development industry is dynamic and involves continuous innovation, a requirement that Microsoft disclose

significant information to its competitors would be unworkable. Who would determine what information is "significant?" At the least, the determination would have to be subject to judicial scrutiny by judges who lack the competence—either as direct decision-makers or as reviewing authorities—to decide the technical issues involved. Delay and confusion would be inevitable, and the software development process would be strangulated. *See, e.g., See Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 542 (9th Cir. 1991); *Berkey Photo,* 603 F.2d at 282.

■ Even assuming, however, that the essential facility doctrine were properly applicable in a case such as this, plaintiffs have failed to meet one of its critical elements: that Microsoft has denied to ISVs a product or service that was necessary for them to compete in the applications software development market.[3] In their memorandum opposing Microsoft's motion for partial summary judgment plaintiffs argue:

> [We] do not contend that Microsoft completely and permanently denied ISVs all access to Windows specifications. Microsoft's competitors' limited ability to

---

**2.** Indeed, *California Computer Prods.* and *ILC Peripherals* do not specifically address essential facilities claims at all.

**3.** To some extent, the parties disagree about how the term "essential" should be defined. Microsoft argues that it should be viewed literally. *See Alaska Airlines, Inc.,* 948 F.2d at 542 ("[T]he essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm *must obtain in order to compete with the first.*") (emphasis added); *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990) ("As the word 'essential' indicates, a plaintiff must show more than inconvenience, or even some economic loss; he must show that an alternative to the facility is not feasible."). Plaintiffs argue that a resource is essential if competitors must have access to it in order to mean-

ingfully compete with the firm controlling the facility. *See Fishman v. Estate of Wirtz,* 807 F.2d 520, 539 (7th Cir.1986) ("To be essential, a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants."); *In re Air Passenger Computer Reservations Sys. Antitrust Litig.,* 694 F.Supp. 1443, 1451 (C.D.Cal.1988) ("An essential facility is one which cannot be reasonably duplicated and to which access is necessary if one wishes to compete.")

In the final analysis, however, this disagreement is immaterial. Whatever the outer perimeters of the essential facility doctrine may be, at its center lies the point that access to the facility must be necessary for meaningful competition. Plaintiffs have failed to present sufficient evidence to prove that the APIs to Windows are "essential" within that meaning of the term.

compete in the relevant applications markets was due to their ability to get some or late access to the specifications. But the competitors' limited success in no way implies that access to the specifications was not essential— only that partial or late access to an essential facility permitted limited competitive success. *If Microsoft had denied ISVs any access to the Windows specifications, there is no doubt that they would have enjoyed no competitive success.* (Pls.' Opp. at 25 (emphasis added).)

As the penultimate sentence of this argument indicates, plaintiff's position is grounded upon a hypothetical assertion about what Microsoft could have done if it chose to do so. Plaintiffs have not, however, cited any authority to support the proposition that a monopolist in control of an essential facility is liable solely on the basis of the potential of its power rather than for the actual exercise of that power. Moreover, there is a logical flaw at the fundament of plaintiffs' argument. The "feedback effect," upon which in theory and in reality Microsoft's maintenance of its monopoly in the operating system is largely based, depends upon Microsoft en-

couraging ISVs to choose the Windows operating system. (*See, e.g.,* Stiglitz Report at 12; Warren–Boulton Report at 37.) If Microsoft foreclosed ISVs from access to the APIs they needed to write applications programs, it would have been undermining the structure upon which its operating system monopoly was based.

That is not to say, of course, that Microsoft did not sometimes use its superior knowledge of its own APIs to obtain a "first mover advantage" in the applications market. (*See* Stiglitz Report at 17; Warren–Boulton Report at 67; *see also* Alepin Report at 132.) However, the essential facility doctrine has never been interpreted to deny a person the right to gain temporary benefits from innovations to its own products. *Berkey Photo,* 603 F.2d at 282; *David L. Aldridge Co. v. Microsoft Corp.,* 995 F.Supp. 728, 755–56 (S.D.Tex. 1998); *Data Gen. Corp.,* 761 F.Supp. at 192; *see also Intergraph Corp.,* 195 F.3d at 1357–58; *GAF Corp.,* 519 F.Supp. at 1229.[4]

## II.

■ The doctrine of market leveraging is derived from dictum in *Berkey Photo.* 603 F.2d at 275–76.[5] The Fourth Circuit

---

**4.** I also note that one of plaintiffs' experts has opined that there is a "second mover advantage" in having "the market ... well-identified ... with an established price point ... [and in] hav[ing] before them an identified target with a feature list to which they can add or subtract functionality to meet revealed consumer demand." (*See* Alepin Rebuttal Report at 29.)

**5.** Although the parties have not argued the point, it is not clear to me that even under the *Berkey Photo* dictum a marketing leveraging claim would be viable here. In concluding its discussion of marketing leveraging, the Second Circuit stated: "[N]or does an integrated business offend the Sherman Act whenever one of its departments benefits from association with the division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of

its broad-based activity, more efficient production, greater ability to develop complementary products, reduce transactions costs, and so forth. These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power." 603 F.2d at 276.

Of course, I recognize (as plaintiffs undoubtedly would argue) that *Berkey Photo* is distinguishable in that no finding had been made that Kodak had unlawfully acquired or maintained its monopoly in the market from which it was leveraging its power into another market. However, this distinction would seem to be beside the point since the Second Circuit was saying that an integrated company's taking advantage of its competitive advantages, including "greater ability to develop complementary products," simply is not to "be considered use[] of monopoly power."

has declined to decide whether "monopoly leveraging is an independent § 2 violation separate from monopolization and attempted monopolization." *Advanced Health–Care Serv. v. Radford Comm. Hosp.,* 910 F.2d 139, 149 n. 17 (4th Cir.1990); *M & M Medical Supplies v. Pleasant Valley Hosp.,* 981 F.2d 160, 168–69 (4th Cir. 1992).[6] The concept that Microsoft leveraged its monopoly power in the operating system market to obtain and increase power in applications software markets may well be relevant to the claims for monopolization and attempted monopolization that plaintiffs assert in counts II, III, and IV. However, in my view "monopoly leveraging" does not exist as a separate and independent claim that can be made out, as suggested by *Berkey Photo,* merely by establishing that the defendant obtained a "competitive advantage" in the second market rather than showing an actual or threatened monopoly in the second market. In other words, in order to prove a § 2 violation in the second market, a plaintiff must meet the elements either of an attempted monopolization or monopolization claim. *See, e.g., Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 206 (3d Cir.1992); *Alaska Airlines,* 948 F.2d at 548; *Intergraph Corp.,* 195 F.3d at 1359–60. Accordingly, to the extent that plaintiffs seek to assert free standing monopoly leveraging claims, Microsoft is granted summary judgment as to such claims.[7]

A separate order effecting the rulings made in this memorandum is being entered herewith.

**6.** Two district courts in the Fourth Circuit have concluded that the court of appeals would not recognize the monopoly leveraging doctrine. *Bepco, Inc. v. Allied–Signal, Inc.,* 106 F.Supp.2d 814, 833 (M.D.N.C.2000); *Advanced Health–Care Servs., Inc. v. Giles Mem. Hosp.,* 846 F.Supp. 488, 496–97 (W.D.Va. 1994).

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 6th day of June 2003

### ORDERED

1. Plaintiffs' request to voluntarily dismiss count VII made in their opposition memorandum is granted; and

2. Microsoft's motion for partial summary judgment is granted as to plaintiffs' essential facility claims and their monopoly leveraging claims.

**7.** I note that as a practical matter this ruling is academic because in their opposition memorandum, plaintiffs have voluntarily accepted the burden of proving actual or threatened monopolies in the relevant application software markets. (Pls.' Opp. at 27.)