**DAISY MOUNTAIN FIRE DISTRICT, Plaintiff,**

v.

**MICROSOFT CORPORATION, Defendant.**

### Civil No. JFM 07–2851.

United States District Court, D. Maryland.

April 16, 2008.

Gary A. Gotto, Mark D. Samson, Keller Rohrback PLC, Phoenix, AZ, Lynn Lincoln Sarko, Mark A. Griffin, Michael D. Woerner, Raymond J. Farrow, Keller Rohrback LLP, Seattle, WA, for Plaintiff.

Jessica S. Pers, Robert A. Rosenfeld, Heller Ehrman White McAuliffe LLP, San Francisco, CA, John A. Jurata, Jr., Heller Ehrman LLP, Washington, DC, G. Stewart Webb, Jr., Venable LLP, Baltimore, MD, for Defendant.

## OPINION

J. FREDERICK MOTZ, District Judge.

Plaintiff Daisy Mountain Fire District ("Daisy"), a political subdivision of the State of Arizona, has brought suit against Microsoft Corporation ("Microsoft") under the Arizona Antitrust Act, Arizona Revised Statutes ("A.R.S.") § 44–1401 *et seq.* (Am. Compl.¶ 1.) Specifically, Daisy alleges that Microsoft has unlawfully maintained monopoly power in the operating system, word processing applications, and spreadsheet applications markets in violation of A.R.S. § 44–1403,[1] resulting in artificially inflated prices for its products in these three markets (Counts I–III). (*Id.* ¶¶ 175–83.) In addition, Daisy alleges that Microsoft has unlawfully leveraged that monopoly power and denied access to its operating system software, to foreclose competition in the Windows-compatible word processing applications and spreadsheet applications markets in violation of A.R.S. § 44–1403 (Counts IV–V). (*Id.* ¶¶ 114–26, 184–91.)

Microsoft has moved to dismiss a substantial portion of plaintiff's claims. Microsoft makes two arguments: (1) that the Arizona Antitrust Act's four-year limitations period bars all damage claims arising prior to July 24, 2003; and (2) that plaintiff's "monopoly leveraging" and "essential facility" claims (Counts IV–V) should be dismissed in their entirety. (Def.'s Mem. at 2.) According to Microsoft, monopoly leveraging is not an independent basis of liability separate from plaintiff's monopolization claims, and the essential facilities doctrine does not require a defendant to share its technological innovations or information. (*Id.*) For the reasons stated below, I will grant Microsoft's motion.

### I.

The facts, as alleged in plaintiffs' amended complaint, are as follows. Since

---

1. A.R.S. § 44–1403 provides: "The establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within the state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful."

the mid–1980s, Microsoft has dominated the operating system software market, in which its United States market share at times has exceeded 95 percent. (Am. Compl.¶ 2.) Beginning in the late–1980s and continuing through the present, Microsoft engaged in a series of predatory acts designed to, and which did, eliminate competition and prevent entry in the operating system software market. (*Id.*) Through its exclusionary conduct, Microsoft "fended off" three types of challenges to its operating system monopoly. (*Id.* ¶ 56.) First, between 1988 and 1994, Microsoft eliminated two competing operating systems, DRI's DR DOS and IBM's OS/2, from the market. (*Id.* ¶¶ 2, 56, 70–79.) Second, from 1988 to the present, Microsoft directed its exclusionary conduct at "middleware" [2] software products, including Micrografx's Mirrors, Borland's C++, Intel's Native Signal Processing, Netscape's Navigator, Sun Microsystem's Java Technologies, and Real Networks's Digital and Streaming Media Technology. (*Id.* ¶¶ 3, 57, 85–107.) Finally, beginning in 1989, Microsoft directed its exclusionary acts at office productivity applications, particularly word processing and spreadsheets programs (including Lotus 1–2–3), whose cross-platform possibilities threatened Microsoft's operating system monopoly. (*Id.* ¶¶ 4, 58, 110–13.) As a result of its unlawful conduct, Microsoft has dominated these applications markets since at least the mid–1990s, achieving market shares in each exceeding 90 percent. (*Id.* ¶ 4.)

Microsoft has allegedly used its monopoly power over operating systems, word processing applications, and spreadsheet applications software to injure consumers of its products, including plaintiff, primarily by charging supra-competitive prices for these three types of software (both as stand-alone products and as part of the Microsoft office suite). (*Id.* ¶ 5.) Plaintiff seeks to recover damages sustained as a result of this conduct, primarily the overpayments made to Microsoft for these three types of software. (*Id.* ¶ 6.) Plaintiff also seeks treble damages and costs, including an award of reasonable attorneys' fees. (*Id.*)

## II.

In *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007), the Supreme Court held that, in order to survive a motion to dismiss, a plaintiff must plead plausible, not merely conceivable, facts in support of her claim.[3] The complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.... Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 1965. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1960. In considering a motion to dismiss, a court must "accept the factual allegations of the complaint as true and must view the

---

**2.** "Middleware" are complementary software products that can substitute for or enhance the functionality of the operating system, potentially weakening or eliminating the applications barrier to entry by "commoditizing" the operating system. Thus, middleware products had the potential to become direct competitors and/or to strengthen the position of actual or potential competitors. (*Id.* ¶¶ 3, 65.)

**3.** Prior to *Twombly, Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), set the standard, granting 12(b)(6) dismissals for failure to state a claim only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

complaint in the light most favorable to the plaintiff." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir.2001).

## III.

█ Microsoft argues that plaintiff's claims for damages for purchases made more than four years before plaintiff's original complaint was filed should be dismissed. (Def.'s Mem. at 5.) As Daisy conceded during the motions hearing held on March 7, 2008, the Arizona Antitrust Act's four year statute of limitations applies in the instant case. Daisy had argued in its Opposition that the four year limitations period did not apply because Arizona courts have "broad[ly]" exempted Arizona state entities from statutes of limitations under the common law doctrine of *nullum tempus occurrit regi*.[4] (Pl.'s Opp'n at 2–3.) Under A.R.S. § 44–1408's plain language, however, this doctrine clearly does not apply. A.R.S. § 44–1408(A) expressly creates a cause of action limited to governmental entities ("[t]he state, a political subdivision or any public agency"),[5] while

A.R.S. § 44–1410(B) provides that "[a]n action under A.R.S. § 44–1408 to recover damages is barred if it is not commenced within four years after the cause of action accrues...."[6] Plaintiff filed its original complaint on July 24, 2007 in the Superior Court of the State of Arizona. Accordingly, unless the statute of limitations was tolled, A.R.S. § 44–1410 would bar all overcharge claims for the period before July 24, 2003 because those purchases occurred, and the claims based on them accrued, more than four years before plaintiff filed its original complaint.

█ Microsoft argues that plaintiff cannot rely on class action tolling to extend the damages period beyond July 24, 2003.[7] The class action tolling doctrine provides that the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *see also Crown, Cork & Seal*

**4.** The *nullum tempus* doctrine provides that "where the sovereign state is prosecuting a suit solely for its own benefit in its official capacity, statutes of limitations do not run against it, *unless* the legislative authority has specially and specifically provided that they do." *City of Bisbee v. Cochise County*, 50 Ariz. 360, 72 P.2d 439, 441 (1937) (emphasis added).

**5.** A.R.S. § 44–1408(A) provides: "The state, a political subdivision or any public agency threatened with injury or injured in its business or property by a violation of this article may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees."

**6.** A.R.S. § 44–1410(B) provides further: "... or within one year after the conclusion of any timely action brought by the state under ... § 44–1408, subsection A, based in whole or in

part on any matter complained of in the action for damages, whichever is later." The potential applicability of this portion of A.R.S. § 44–1410(B) is discussed *infra*.

**7.** Microsoft also argues that despite plaintiff's allegation of "*continuing* [anticompetitive] conduct" on the part of Microsoft, (Am. Compl. ¶¶ 131–171 (emphasis added)), plaintiff should not recover damages for purchases outside the four year limitations period. (Def.'s Mem. at 7.) I conclude, as Microsoft has argued (and Daisy has not disputed), that the "continuing violation doctrine" set forth in *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir.1986) does not apply in the instant case. Microsoft appropriately conceded at the motions hearing, however, that it is an issue of causation whether any illegal conduct prior to July 24, 2003 had harmful effects on the price of the Microsoft products at issue in this litigation after that date.

*Co. v. Parker*, 462 U.S. 345, 350, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) ("The filing of a class action tolls the statute of limitations as to all asserted members of the class . . . .") (internal citations omitted). The class action that potentially suspended the statute of limitations as to plaintiff in the instant case is *Friedman v. Microsoft Corp.*, No. CV 2000–000722 (Ariz. Sup.Ct., Maricopa County Jan. 12, 2000), which was filed on January 12, 2000. (Rosenfeld Decl. ¶ 2.) Both Microsoft and Daisy agree that the filing of the *Friedman* class action tolled the limitations period.[8] (Def.'s Mem. at 9–10; Pl.'s Opp'n at 4–5.) Their disagreement centers on when, if ever, the tolling period ended.

### A.

■ Microsoft contends that, at the earliest, tolling ended when the *Friedman* plaintiffs filed their Amended/Consolidated Class Action Complaint on January 2, 2003, thereby "expressly excluding 'governmental entities' from that case" more than four years prior to the filing of Daisy's original complaint.[9] (Def.'s Mem. at

9.) In support of this argument, Microsoft cites several federal district court cases concluding that class action tolling ends when a purported class member ceases to be a member of a putative class. (*Id.*) For example, in *In re Microsoft Corp. Antitrust Litigation II*, I held that tolling ceased when class counsel filed a motion for class certification excluding governmental entities from the class. 2005 WL 906364, at *4 (D.Md.2005) (citing *Smith v. Pennington*, 352 F.3d 884, 894 (4th Cir. 2003) ("When a plaintiff moves for class certification by asserting an unambiguous definition of his desired class that is more narrow than is arguably dictated by his complaint, his asserted class for tolling purposes may be limited to that more narrow definition.")).[10]

Similarly, *Ganousis v. E.I. du Pont de Nemours & Co.* held that a purported class member ceases to be a member of the putative class as soon as class counsel files a motion excluding that class member. 803 F.Supp. 149, 156 (N.D.Ill.1992). Accordingly, the court determined that when

**8.** Microsoft argues, however, that to the extent that class action tolling applies at all in this case, it can only apply for purchases of Windows 98 because the original complaint in *Friedman* was limited to purchases of that product. (Def.'s Mem. at 9 n. 6; Def.'s Reply at 5 n. 3; Rosenfeld Decl. ¶ 2, Ex. A ¶ 1). Because I conclude *infra* that class action tolling ended before the July 24, 2003, this issue is moot.

**9.** The "Class Action Allegations" section of the *Friedman* amended complaint stated in relevant part:

Plaintiffs bring this action as a class action pursuant to Ariz. R. Civ. P. 23, on their own behalf and on behalf of all other members of the two classes (the "Classes") described below . . .:(a) all persons or entities in the State of Arizona who purchased or acquired for purposes other than re-sale or distribution Microsoft Operating System Software. The Class *excludes* Defendant

and their co-conspirators, their subsidiaries, affiliates, officers, and employees, and *governmental entities* (the "Operating System Software Class"); and (b) all persons or entities in the State of Arizona who purchased or acquired for purposes other than re-sale or distribution, Microsoft Application Software. The Class *excludes* Defendant and their coconspirators, their subsidiaries, affiliates, officers, and employees, and *governmental entities* (the "Application Software Class").

(Rosenfeld Decl. ¶ 3, Ex. B, *Friedman* Am. Compl. ¶ 58 (emphasis added).)

**10.** In *In re Microsoft Corp. Antitrust Litigation II*, I noted that California, not federal, law applied to the tolling question. 2005 WL 906364, at *4. However, plaintiffs had not cited any California case that would dictate a different result than that dictated by federal law. (*Id.*) Likewise, Daisy has not cited any Arizona case law, nor have I have found any, that dictates a different result here.

class counsel "unequivocally focused their sights [in their motion for class certification] as including within the proposed class *only* Minnesota residents—and thus as *excluding* [Ganousis]"—the tolling of the statute of limitations ended. *Id.* at 155–56 (emphasis in original). *Ganousis* rejected plaintiff's argument that only a court's determination of class certification, not a class counsel's motion, could end the tolling. *Id.* at 156; *see also Del Sontro v. Cendant Corp.,* 223 F.Supp.2d 563, 581 (D.N.J.2002) ("When class certification is denied, or a purported class member for any reason ceases to be a member of the putative class, the toll ends by operation of law and the limitations period begins to run immediately.") (holding that class counsel's filing of an amended complaint, which did not include plaintiff as a class member, would have ended the tolling of the statute of limitations).

### B.

Microsoft argues in the alternative that two events between January 2, 2003 (when the *Friedman* amended complaint was filed) and July 24, 2003 (four years prior to Daisy's original complaint) also ended any tolling that may have previously been in effect. (Def.'s Mem. at 11 n. 7.) First, the *Friedman* plaintiffs filed a "Motion to Certify Classes As Now Defined In Their Amended/Consolidated Class Action Complaint For Damages" on February 5, 2003. (Rosenfeld Decl. ¶ 4, Ex. C.) In the prayer for relief in their motion, they requested that the court "amend the class definition previously adopted and certify the classes as now defined in the Amended Consolidation Complaint in this action." (*Id.,* Ex. C at 20.) Microsoft contends that even if the *Friedman* plaintiffs' amendment of their

complaint did not end tolling, this motion certainly did. *See In re Microsoft Corp. Antitrust Litig. II,* 2005 WL 906364, at *4; *Ganousis,* 803 F.Supp. at 155–56; *Sawtell v. E.I. du Pont de Nemours & Co.,* 22 F.3d 248, 253–54 (10th Cir.1994) (holding that although the complaints did not limit the class to consumers from any particular state, when plaintiffs' motion for class certification limited the suit to those who received implants in Minnesota, their asserted class for tolling purposes was that more narrow definition).

Second, on May 12, 2003, the court "grant[ed] the [*Friedman* ] Plaintiffs' Motion to Certify Classes as Amended." (Rosenfeld Decl. ¶ 5, Ex. D.) Because Daisy filed the instant suit more than four years after these dates, Microsoft concludes that "class action tolling is irrelevant, . . . the applicable statute of limitations has expired[,][and][a]ll claims for damages arising from purchases before July 24, 2003 in Count I through V of the Amended Complaint should therefore be dismissed." (Def.'s Mem. at 11.)

Daisy argues in opposition that the class action tolling period extended at least through the date on which the Superior Court of Arizona approved the *Friedman* settlement (December 10, 2004),[11] and may still be in effect. (Pl.'s Opp'n at 4–7.) Daisy primarily makes two arguments.

### (1)

First, Daisy contends that neither Friedman's class counsel's motion to certify the amended class nor the court's granting of the motion changed the class definition to exclude governmental entities. (*Id.* at 5–6.) According to Daisy, the motion asked the court to amend its prior class

---

11. Daisy cites the date of the *Friedman* settlement as December 10, 2004, (Pl.'s Opp'n at 6), and December 4, 2004, (Pl.'s Opp'n at 10). December 10, 2004 is the correct date. (Griffin Decl., Ex. D at 5.)

certification order [12] only to add claims for additional products: operating systems other than Windows 98 and the same set of Microsoft's application products that are at issue in the instant case. (*Id.* at 5.) Daisy asserts that the *Friedman* plaintiffs specifically stated that there were no changes to the class definition other than expanding the products that were to be covered. The motion to certify the amended class stated:

> Plaintiffs move again to certify the classes as now defined in Plaintiff's operative complaint. This motion is really a procedural formality given that this Court has already certified a class in this case, and that Microsoft has stipulated to the filing of the Amended Consolidated Complaint *which differs only in that it includes similar factual allegations related to additional operating systems and three application programs.* There is absolutely no reason why the Court should not now certify these newly defined classes—classes which now most properly encompass *all those who were damaged by Microsoft's anti-competitive conduct.*

(Rosenfeld Decl., Ex. C, at 2) (emphasis added in Pl.'s Opp'n at 6.)

Similarly, Daisy argues, the *Friedman's* court granting of the motion to certify the amended class did not eliminate any existing class members, but simply added the additional Microsoft products. (Pl.'s Opp'n at 6.) The court's Minute Entry stated: "After considering the memoranda and arguments of counsel, the Court grants the Plaintiffs' Motion to Certify Classes as Amended. *The class therefore includes the operating systems and applications.*" (Rosenberg Decl., Ex. D. (emphasis added).) Daisy contends that the Minute Entry was "completely consistent" with Friedman class counsel's request to certify the amended class to simply add additional Microsoft products. (Pl.'s Opp'n at 6.)

It is true that both the *Friedman* plaintiffs' motion to certify the amended class and the court's granting of that motion emphasized the addition of operating systems and application programs to the suit (which apparently expanded the class), not the simultaneous narrowing of the class in other respects. However, Daisy's argument ultimately fails because it ignores the fact that the *Friedman* plaintiffs' motion to certify the amended class asserted an unambiguous definition of their desired class that was narrower than in their original complaint. *See Smith*, 352 F.3d at 893–94. In the original complaint, plaintiffs broadly defined the class to include "Plaintiffs and all others similarly situated." (Rosenfeld Decl., Ex. A ¶ 1.) In their amended complaint, as discussed above, they defined the class as consisting of two classes, both of which explicitly excluded "government entities." [13] (*Id.*, Ex. B ¶¶ 6–7, 58.) Finally, in their motion to certify the amended class, they explicitly requested the court, as Daisy has quoted, "to certify the classes as now defined in Plaintiff's [amended] complaint." (*Id.*, Ex. C, at 2; Pl.'s Opp'n at 6.)

---

**12.** On November 14, 2000, the *Friedman* court issued an order certifying the class in the plaintiffs' original complaint, including plaintiff Daisy and other members of the proposed class in the instant case.

**13.** Daisy attempts to divert attention from the amended complaint by highlighting the *Friedman* plaintiffs' motion to consolidate on February 9, 2001, (Griffin Decl., Ex. C), which Daisy insists "only informed the court that it was plaintiffs' intent to consolidate so as to add claims for damages arising from conduct relating to various applications products, not to delete any class member or any claims." (Pl.'s Opp'n at 5 n. 4.) Regardless, however, this has no effect on the amended complaint's explicit exclusion of governmental entities.

The *Friedman* plaintiffs incorrectly stated in their motion to certify the amended class that their amended complaint "differ[ed] only in that it includes similar factual allegations related to additional operating systems and three application programs." *Id.* This mistake does not change the fact that the *Friedman* class had been redefined not to include government entities when the court granted class counsel's January 2, 2003 motion to amend the complaint.[14] Similarly, that the court specified in granting the motion that "[t]he class therefore includes the operating systems and applications" does not contradict the conclusion that it simultaneously narrowed the class to exclude governmental entities. (Rosenfeld Decl., Ex. D.) In fact, the *Friedman* court's Minute Entry explicitly "grant[ed] the Plaintiffs' Motion to Certify Classes as Amended." (*Id.*) Those "classes as amended" expressly did not include government entities. (Rosenfeld Decl. ¶ 3, Ex. B, Friedman Am. Compl. ¶ 58.)

### (2)

Daisy's second argument is that, even assuming that the *Friedman* court's Minute Entry on May 12, 2003 changed the class definition, it constituted a dismissal of government entities without notice, and thus could not have ended class action tolling. Daisy asserts that in contrast to the cases Microsoft cites[15]—where tolling ended when *class counsel* excluded an individual from a *putative* class—tolling could end for members of the *certified* class in the *Friedman* case only if the *court* excluded them. (Pl.'s Opp'n at 7.) Furthermore, Daisy argues that a court altering membership of a certified class must provide actual notice in compliance with the procedural due process requirements of *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), and Rule 23 of the Arizona Rules of Civil Procedure. (*Id.* at 6–8.) According to Daisy, because these requirements were not met until (at the earliest) the *Friedman* court approved settlement on December 10, 2004, tolling continued until then. (*Id.*)

 Daisy's second argument is also unpersuasive. Daisy provides no legal support for its contention that after a class is certified, only an action taken by the court, not class counsel, can end tolling. Further, even assuming that Daisy's contention is correct, I conclude that a court order narrowing the class definition after class certification can end tolling without providing actual notice to the parties it excludes. Accordingly, the *Friedman* court's May 12, 2003 order ended tolling in the instant case, notwithstanding the fact that it did not give actual notice to the government entities, such as Daisy, which it excluded from the *Friedman* class.

14. Daisy asserts that only in the prayer for relief in the motion to certify the amended class, "but nowhere else," did the *Friedman* plaintiffs ask the court to "amend the class definition previously adopted and certify the class as now defined in the Amended Consolidated Complaint." (Pl.'s Opp'n at 6 n. 5.) Daisy ignores the title of the motion ("Motion to Certify Classes As Now Defined In Their Amended/Consolidated Class Action Complaint For Damages") and the first sentence in the body of the motion ("Plaintiffs move again to certify the classes as now defined in Plaintiffs' operative complaint"). (Rosenfeld Decl., Ex. C at 2.) In any event, the one sentence in the prayer for relief alone suffices to demonstrate the *Friedman* plaintiffs' intent to adopt the amended complaint's newly defined class excluding governmental entities.

15. *American Pipe,* 414 U.S. at 554, 94 S.Ct. 756; *Crown, Cork & Seal Co.,* 462 U.S. at 350, 103 S.Ct. 2392; *In re Microsoft Corp. Antitrust Litig. II,* 2005 WL 906364, at *4; *Smith,* 352 F.3d at 893–94; *Ganousis,* 803 F.Supp. at 155–56.

Ganousis explained why actual notice is not required to end the tolling of the statute of limitations for individuals who have been excluded from a putative class:

It must be remembered that the courts are dealing in fictions here—that the concepts on both sides involve constructive and not actual notice. In fairness such doctrines must be employed consistently, both when they are amiable fictions that benefit a plaintiff and when they rise up to bite the same plaintiff.

803 F.Supp. at 156.

In other words, the "evenly-applied fiction" is that just as a class member of a putative class receives the benefit of tolling because he is assumed to have knowledge of the pending class action, he also suffers the harm of termination of tolling because he is assumed to have knowledge of class counsel's or the court's decision to exclude him from the proposed class.

Unlike in *Ganousis*, however, the *Friedman* class had already been certified when the court altered the membership of the class in its May 12, 2003 order. For this reason, Daisy argues that "[n]o such fiction applies[;] ... [a] court [may] end an entity's membership in the class ... only ... if it complies with the procedural requirements of *Shutts*, 472 U.S. 797, 105 S.Ct. 2965." [16] (Pl.'s Opp'n at 8.) In *Shutts*, the

Supreme Court held that a forum state may only bind an absent plaintiff concerning a claim for money damages if it "provide[s] minimal procedural due process protection," specifically "notice[,][ ] an opportunity to be heard and participate in the litigation[,] ... [and] an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." 472 U.S. at 811–12, 105 S.Ct. 2965. Similarly, in *Brown v. Ticor Title Insurance Co.*, the Ninth Circuit held that because the plaintiff had no opportunity to opt out of the previous MDL litigation, there would be a violation of minimal due process if the plaintiff's damage claims were held barred by *res judicata*. 982 F.2d 386, 392 (9th Cir.1992) (citing *Shutts*, 472 U.S. at 811–12, 105 S.Ct. 2965).

Both *Shutts* and *Brown* are distinguishable from the situation in the instant case, however. In both cases, at issue was whether an absent class member could be bound to a class action judgment without notice, and thus barred by *res judicata* from bringing his own damages claims. In the instant case, in contrast, the issue is whether class action tolling applies to Daisy, notwithstanding Daisy's assertion that it did not receive notice of its exclusion from the certified class in *Friedman*. Accordingly, the due process concerns that *Shutts* addressed are not implicated in the

---

**16.** During the motions hearing on March 7, 2008, plaintiff argued further that the "fiction" of *constructive* notice described in *Ganousis*, 803 F.Supp. at 156, does not apply to the instant case because the *Friedman* court's May 12, 2003 Minute Entry gave *actual* notice that the newly certified class still included government entities. As I discussed *supra*, however, the fact that the *Friedman* court's order stated that the newly certified class "therefore includes the operating systems and applications," (Rosenberg Decl., Ex. D), did not contradict the fact that the newly certified class simultaneously excluded government entities, (*see* Rosenfeld Decl. ¶ 3, Ex. B, *Friedman* Am. Compl. ¶ 58.) Furthermore, as I noted during the motions hearing, if Daisy had understood from the *Friedman* court's May 2003 order that it was still a member of the class, it is unclear why it did not intervene at any point in the suit, or move to opt out of the suit before it settled on December 10, 2004. Indeed, precisely because Daisy was no longer part of the *Friedman* action in December 2004, it was not bound by the settlement and thus not barred from filing its own individual claims in July 2007.

present case. The basis for the holding in *Shutts* was that without the opportunity to opt out, the plaintiff faced a complete bar to his claims; no such concern is present here because, after the class definition was narrowed, Daisy was free to initiate an action on its own behalf for another four years.

Daisy contends, however, that in class action tolling cases, a court's certification of the class changes this dynamic: class members now presume that the limitations period has been tolled, and actual notice is required to inform them of their exclusion from the class. (Pl.'s Opp'n at 10.) Daisy presents no case law directly supporting this position. However, it does cite *Ross v. Warner,* 80 F.R.D. 88 (S.D.N.Y.1978), where, even though the class had not yet been certified, the court nevertheless required public notice to inform individuals that they had been excluded by plaintiffs' amended complaint. In Ross, nearly a year after plaintiffs amended their complaint to expand the class, they filed a second amended complaint reducing the class by 90 percent and restoring it to substantially what it was at the commencement of the action. 80 F.R.D. at 91. Although there had been no formal notice of the action, the court was concerned that because "[s]uch serious and newsworthy allegations [were] made against a huge corporation[,] ... the soon-to-be-abandoned class members [might have] received actual notice of the institution of this suit through national publicity and were perhaps deterred from instituting their suits in reliance on their class membership." *Id.* Acknowledging that "[i]ndividual notice is neither required nor warranted under the circumstances," the court ordered that it would grant the plaintiffs' motion to amend only if the plaintiffs submitted notice of the action in certain newspapers. *Id.* at 92.

*Ross,* however, is distinguishable from *Friedman* because it was concerned that absent class members had received *actual notice* of their inclusion in the suit and relied upon it to protect their interests. Daisy specifically concedes that this was not the situation in this case. (Pl.'s Opp'n at 5 ("... Arizona governmental entities have been members of a certified class since November [14,] 2000, although they did not receive notice of that fact").) *Ganousis* distinguished *Ross* for the same reason: "[N]othing in this case has suggested that the institution or pendency of the [class action] lawsuits created any meaningful amount of *actual* notice, and *actual* reliance of the kind spoken of [in *Ross* ], as contrasted with fictions of constructive notice, and therefore of presumed reliance, that have been discussed in the text of this opinion." 803 F.Supp. at 158 (emphasis in original).

Several other courts have likewise held that notice of a change in class action status is not required where absent class members did not receive notice of the earlier certification. *See Hervey v. City of Little Rock,* 787 F.2d 1223, 1230 (8th Cir. 1986) (noting that "notice of the decertification is required only to the extent necessary to reach those potential class members who received notice of certification and relied on being included in the class"); *Clarke ex rel. Pickard v. Ford Motor Co.,* 228 F.R.D. 631, 637 (E.D.Wis.2005) (concluding that notice of decertification was not required because there was no risk of a class member missing the limitations period for his own individual action as a result of decertification: class certification had received no publicity, the court had not sent notice of certification to class members, and there was no indication that any class member learned of the case); *Seligson v. Plum Tree, Inc.,* 61 F.R.D. 343, 346 (E.D.Pa.1973) (holding that "[s]ince no notice was originally sent to prospective

members, no one could have justifiably relied on our conditional class action determination[, and thus] [ ] we need not send notice of this dissolution of the class"). Accordingly, only if Daisy had been notified of class certification would it have had a due process right to notification of decertification. Because Daisy concedes that it was not notified of the *Friedman* court's November 2000 class certification, (Pl.'s Opp'n at 5), it did not have a right to notice of the court's May 2003 order granting the plaintiffs' motion to certify classes as amended.

Daisy's argument that it had a right to notice of decertification under Rules 23(c)(2) [17] and 23(e) [18] of the Arizona Rules of Civil Procedure is also unavailing. The purpose of the notice required by Rules 23(c)(2) and 23(e)—just like with Rules 23(c)(2) [19] and 23(e) [20] of the Federal Rules of Civil Procedure—is to protect class members whose individual claims might later be dismissed with prejudice. A.R.C.P Rule 23(c)(2) requires the court to give class members notice of their right to opt out of the certified class. A.R.C.P. 23(e) requires the court to give class members notice of the dismissal or settlement of the class action. Both rules are concerned with ensuring that class members' individual claims are not later barred by *res judicata* without having first notified them of this danger. In contrast, as explained above, the May 12, 2003 order in *Friedman* affected only when class action tolling ended, and did not result in Daisy's individual claim being dismissed with prejudice.[21]

## C.

Daisy finally argues that under A.R.S. § 44–1410(B), the statute of limitations has not yet accrued. (Pl.'s Opp'n at 11.)

---

**17.** Rule 23(c)(2) provides that if a class action is maintained under subdivision (b)(3), "the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion...." Ariz. R. Civ. P. 23(c)(2).

**18.** Rule 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Ariz. R. Civ. P. 23(e).

**19.** Rule 23(c)(2)(B) provides: "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B).

**20.** Rule 23(e) provides: "The following procedures apply to a proposed settlement, volun-

tary dismissal, or compromise: (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal...." Fed.R.Civ.P. 23(e).

**21.** Furthermore, in *Clarke*, the Eastern District of Wisconsin explained that, although under Rules 23(c) and 23(e) of the Federal Rules of Civil Procedure absent members may have a due process right to notification when a class is dismissed or decertified, this notice requirement exists only if the class member received notice of the original certification, because only then is there a concern that the class member will miss the limitations period due to reliance on class action tolling: "in ordering decertification, I have a duty 'to order notice *unless* the risk of prejudice to absent class members is nil....'" 228 F.R.D. at 637 (emphasis added) (citing *Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621, 627 (7th Cir.1986); *Culver v. City of Milwaukee*, 277 F.3d 908, 915 (7th Cir.2002)). Because Daisy concedes that it did not receive *actual notice* of its inclusion in the *Friedman* action, (Pl.'s Opp'n at 5), *Clarke's* conclusion applies equally to the instant case.

A.R.S. § 44–1410(B) provides two different limitations periods: a straight four years following the accrual of the cause of action, or one year "after the conclusion of any timely action brought by the state under ... § 44–1408, subsection A, based in whole or in part on any matter complained of in the action for damages, whichever is later." Daisy contends that it and the state of Arizona remain certified members of the original *Friedman* class (because they could not be "effectively dismissed without notice"), and that the state and state entity claims were not concluded by the December 10, 2004 settlement in *Friedman.* (*Id.*) Therefore, according to Daisy, the *Friedman* action has not been "concluded," and thus the one year statute of limitations has not yet begun. Rather, Daisy insists, its claims extend back to January 12, 1996—four years prior to the filing of the original *Friedman* complaint. (*Id.*) There are two fallacies in this argument. First, the *Friedman* action was not brought by the state under A.R.S. § 44–1408(A).[22] The state and its agencies simply were originally class members. Second, for the reasons stated above, Daisy and the state ceased to be class members at the latest on May 12, 2003.

## IV.

■ Microsoft argues that plaintiff's monopoly leveraging claims in Counts IV–V should be dismissed because they are not a basis for recovery distinct from the monopolization claims plaintiff alleges in Counts I–III. (Def.'s Mem. at 12.) Daisy concedes that federal courts have roundly criticized, and in many cases, rejected the legitimacy of the monopoly leveraging doctrine, which provides that "the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 276 (2d Cir.1979).

The Supreme Court has held that monopoly leveraging does not provide a basis for recovery distinct from a monopolization claim. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (" § 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so."); *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 415 n. 4, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) ("To the extent the Court of Appeals dispensed with a requirement that there be a 'dangerous probability of success' in monopolizing a second market, it erred."). The Fourth Circuit has similarly questioned the legitimacy of the monopoly leveraging doctrine. *See Sun Microsystems, Inc. v. Microsoft Corp.,* 333 F.3d 517, 532 (4th Cir.2003) ("[T]he monopoly leveraging theory ... has not been recognized in this circuit nor has it received general acceptance ... Indeed, monopoly leveraging may have been seriously undermined and perhaps been entirely foreclosed by [*Spectrum Sports, Inc.,* 506 U.S. at 459, 113 S.Ct. at 892].").[23]

---

**22.** A.R.S. § 44–1408(A) provides: "The state, a political subdivision or any public agency threatened with injury or injured in its business or property by a violation of this article may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees."

**23.** *See also In re Microsoft Corp. Antitrust Litigation I,* 274 F.Supp.2d 743, 747 (D.Md. 2003) (" '[M]onopoly leveraging' does not exist as a separate and independent claim that can be made out, as suggested by *Berkey Photo,* merely by establishing that the defendant obtained a 'competitive advantage' in the second market rather than showing an actual or threatened monopoly in the second market.

Plaintiff argues, however, that the language of A.R.S. § 44–1403—under which its claims are asserted—is not identical to that of Section 2 of the Sherman Antitrust Act ("Section 2"), and thus the two statutes should not be identically construed.[24] (*Id.* at 11–12.) While Section 2 declares that monopolies, attempts to monopolize, and conspiracies to monopolize are illegal, A.R.S. § 44–1403 provides that "[t]he establishment, maintenance, or *use* of a monopoly or an attempt to establish a monopoly ... for the purpose of excluding competition" is unlawful. (*Id.* at 12 (emphasis added by plaintiff).) Plaintiff contends that Arizona law's proscription of the "use of a monopoly ... for the purpose of ... excluding competition" reaches beyond the ambit of Section 2 "in that it does not require an [e]ffect on any other market, only an exclusionary purpose." (*Id.*) Indeed, plaintiff contends, the word "leveraging" could be substituted for the word "use" in the Arizona statute. (*Id.*) Therefore, plaintiff submits, the federal courts' criticism of the monopoly leveraging claims under Section 2 does not apply to similar claims brought under Arizona law.

Plaintiff's textual distinction between the two statutes is too fine. As plaintiff concedes, the Arizona courts have never addressed whether a separate monopoly leveraging claim survives under A.R.S. § 44–1403.[25] (*Id.* at 13.) Where, as here, both Arizona and federal law prohibit comparable behavior, the Arizona legislature has made its intent clear that Arizona courts may use federal case law to interpret the Arizona Antitrust Act. *See* A.R.S. § 44–1412 (providing that "in construing [the Arizona Antitrust Act], the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes"). Indeed, the Arizona Court of Appeals has explicitly held that it "analyze[s] the requirements necessary to prove a violation of section 14–1403 under federal case law interpreting § 2 of the Sherman Act." *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 195 Ariz. 50, 985 P.2d 535, 542 (1998); *see also Wedgewood Inv. Corp. v. Int'l Harvester Corp.*, 126 Ariz. 157, 613 P.2d 620, 623 (1980) ("[t]he Arizona Legislature clearly intended to strive for uniformity between federal and state antitrust laws."). In the absence of Arizona case law interpreting the state of the monopoly leveraging doctrine under A.R.S. § 44–1403, I find the federal courts' interpretation of Section 2 of the Sherman Act to be controlling.[26]

In other words, in order to prove a § 2 violation in the second market, a plaintiff must meet the elements either of an attempted monopolization or monopolization claim."); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir.1991) ("We [] reject *Berkey's* monopoly leveraging doctrine as an independent theory of liability under Section 2.").

24. Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

25. Microsoft points out that one potential reason behind the Arizona courts' silence on the issue is that A.R.S. § 44–1403's prohibition of the "use" of a monopoly might simply serve as a synonym for the "maintenance" of a monopoly. *See, e.g. Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1347 (9th Cir.1986) ("To state a valid monopolization claim, [plaintiffs] must allege ... (2) willful acquisition or maintenance ('use') of that power....").

26. In the alternative, plaintiff argues that even if federal precedent applies, plaintiff's leveraging claim asserts a monopoly in both

## V.

 Microsoft argues that plaintiff's essential facility claims in Counts IV and V should be dismissed because the essential facilities doctrine [27] does not apply to technological information or innovations as a matter of law. In *In re Microsoft Corp. Antitrust Litigation I*, 274 F.Supp.2d 743, 745 (D.Md.2003), I granted Microsoft's summary judgment motion because I was persuaded that the essential facilities doctrine should not be applied in a case involving technological innovations or information. I explained that "to require one company to provide its intellectual property to a competitor would significantly chill innovation." *Id.* (citing *Berkey Photo*, 603 F.2d at 281–82; *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 761 F.Supp. 185, 192 (D.Mass.1991); *GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1228 (S.D.N.Y.1981); *ILC Peripherals Leasing Corp. v. Int'l Bus. Machines Corp.*, 458 F.Supp. 423, 437 (N.D.Cal.1978)). Furthermore, "because the software development industry is dynamic and involves continuous innovation, a requirement that Microsoft disclose significant information to its competitors would be unworkable

... Delay and confusion would be inevitable, and the software development process would be strangulated." *Id.* (citing *Alaska Airlines, Inc.*, 948 F.2d at 542).

I reach the same conclusion in the instant case. I recognize that the Fourth Circuit has accepted the essential facilities doctrine where tangible assets were at issue. *See Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150–51 (4th Cir.1990) (reversing district court's refusal to allow amendment of the plaintiff's complaint to add claims for a hospital's denial of a medical equipment supplier's access to the alleged essential facility (patients)); *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 544 (4th Cir.1991) (affirming district court's dismissal of a railroad company's essential facilities claim against a national railroad for alleged denial of access to trackage rights). In addition, courts outside the Fourth Circuit have applied the essential facilities doctrine to numerous types of tangible assets (e.g. electric transmission lines, football and basketball stadiums, downhill ski hills, natural gas pipe-

---

primary and secondary markets under Section 2 of the Sherman Act. (Pl.'s Opp'n at 11–14.) This argument is also unpersuasive. Plaintiff concedes that *Trinko's* requirement that a plaintiff prove a monopoly (or a dangerous probability of success in obtaining a monopoly) to succeed on a monopoly leveraging claim is the same requirement as in a simple monopolization claim. (Pl.'s Opp'n at 13.) However, plaintiff insists that if the facts support that monopoly power in one market was used to gain monopoly power in another market, the claim should nevertheless be allowed to be pleaded and proved, as a separate claim. (*Id.* at 13–14.) This argument relies on semantics. Plaintiff is correct that it may plead and prove a meritorious monopolization claim in a secondary market; however, under the current state of the "monopoly leveraging doctrine," this hypothetical claim would be termed a separate claim as to a wholly different market, not a claim leveraged

on monopoly power in the primary market. *See Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884; *Trinko, LLP*, 540 U.S. at 415, 124 S.Ct. 872; *Sun Microsystems*, 333 F.3d at 532; *In re Microsoft Corp. Antitrust Litig. I*, 274 F.Supp.2d at 747.

**27.** As succinctly characterized by one court, "the essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first." *Alaska Airlines, Inc.*, 948 F.2d at 542. "Whatever the outer perimeters of the essential facilities doctrine may be, at its center lies the point that access to the facility must be necessary for meaningful competition." *In re Microsoft Corp. Antitrust Litigation I*, 274 F.Supp.2d at 745 n. 3.

lines, and local telephone facilities).[28]

However, essential facility claims involving tangible assets are quite different from claims involving technical innovation, and plaintiff fails to provide a compelling argument for applying the doctrine to technological innovations or information. Two of the cases involving technological assets that plaintiff cites did not apply the essential facilities doctrine,[29] while other cases plaintiff cites provide only limited support for its argument.[30] Finally, although plaintiff makes much of the district court's order in *United States v. Microsoft Corp.*, No. 98–1232, 2006 WL 2882808, at *3 (D.D.C. Sept. 7, 2006), to disclose technological information to its competitors, Microsoft's reply brief in the instant case states incisively: "An order to disclose technical information that is made as part of an antitrust remedy does not mean that a firm's failure to provide such to its competitors violates the antitrust laws." (Def.'s Reply at 11 n. 7.) In other words, the district court's order did not find a duty to disclose technological information or innovation under the essential facilities doctrine. This court also declines to find such a duty.

For the foregoing reasons, I grant Microsoft's motion to dismiss. A separate order to that effect is being entered herewith.

## ORDER

In accordance with the Opinion being entered today, it is, this 16th day of April 2008

---

**28.** See *In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F.Supp. 1443, 1451 (C.D.Cal.1988) (collecting cases). Other courts have also acknowledged the essential facilities doctrine. See *Byars v. Bluff City News Co.*, 609 F.2d 843, 856 (6th Cir.1979); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir.1983); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir.1986).

**29.** See *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1357–58 (Fed.Cir.1999), *aff'd*, 253 F.3d 695 (Fed.Cir.2001) ("The notion that the withholding of technical information and samples of pre-release chips violates the Sherman Act, based on essential facility jurisprudence, is an unwarranted extension of precedent and cannot be supported on the premises presented.") (reversing the district court's holding that Intel's superior microprocessor product and Intergraph's dependency thereon converted Intel's special customer benefits into an "essential facility" under the Sherman Act); *Rural Tel. Serv. Co. v. Feist Publ'ns*, 737 F.Supp. 610, 620 (D.Kan.1990), *rev'd in part*, 957 F.2d 765 (10th Cir.1992) (finding that the information contained in the white pages listings was not "essential" because it could be "independently obtained from other sources").

**30.** Although in *Service & Training, Inc. v. Data Gen. Corp.*, 737 F.Supp. 334, 343–44 (D.Md.1990), *aff'd*, 963 F.2d 680 (4th Cir. 1992), I allowed a monopolization claim to proceed beyond summary judgment, I was skeptical that the claim would succeed: "[I]n the final analysis, it appears that [plaintiff's] claims may be based more upon concern over a fundamental structural change occurring in the computer service and repair market rather than upon any conduct engaged in by [defendant] in violation of the anti-trust laws." *Id.* Similarly, *Tri–Tech Machine Sales, Ltd. v. Artos Engineering Co.*, which commented that "[t]he term 'facility' can apply to tangibles ... or [to] the transmission of information and to intangibles such as information itself," 928 F.Supp. 836, 839 (E.D.Wis.1996) (citing Irving Scher, *Antitrust Advisor* § 1.29 at 1–60 (4th ed.1995)), is of limited precedential value both because it addressed whether a *tangible* asset (a manufacturer's spare parts) was an essential facility, and because it decided only that the claim was not frivolous. *Id.* at 839–40. Although *Bellsouth Advertising & Publishing Corp. v. Donnelley Information Publishing, Inc.*, 719 F.Supp. 1551, 1566 (S.D.Fla.1988), *rev'd on other grounds*, 999 F.2d 1436 (11th Cir.1993), allowed plaintiff's essential facility claims to proceed to trial, this case involved Yellow Page "business classifications" and updates of Yellow page listings, assets which are very different from the innovative software in the instant case.

ORDERED that

1. The motion to dismiss filed by Microsoft Corporation is granted, and

2. All claims arising prior to July 24, 2003 are dismissed.